[S.F. No. 23858. Jan. 19, 1979.]

THOMAS L. KOWALSKI, Plaintiff and Appellant, v.
SHELL OIL COMPANY, Defendant and Respondent.

**COUNSEL**

Patrick M. Hyde, Hyde, Lucke & Brewer, Harry A. Allen and William B. Boone for Plaintiff and Appellant.

Robert E. Cartwright, Edward I. Pollock, Leroy Hersh, Stephen I. Zetterberg, Robert G. Beloud, Arne Werchick, William P. Camusi, Ralph Drayton and Leonard Sacks as Amici Curiae on behalf of Plaintiff and Appellant.

David O. Larson, Moore, Rode, Clifford, Wolfe & Larson, Moore, Clifford, Wolfe, Larson & Trutner and Cyril Viadro for Defendant and Respondent.

## OPINION

**BIRD, C. J.**—Plaintiff, Thomas L. Kowalski, appeals from a judgment entered in favor of defendant, Shell Oil Company, in an action for personal injuries. Following trial, the jury returned a verdict in favor of plaintiff but the trial court granted Shell's motion for judgment notwithstanding the verdict. This court must decide whether there was substantial evidence to support the jury's finding that plaintiff was not Shell Oil Company's special employee.

I

On May 21, 1969, the C. Norman Peterson Company (Peterson) and Shell entered into a contract whereby Peterson agreed to perform maintenance work at Shell's refinery in Martinez. The agreement, set forth in a Shell purchase order, provided in pertinent part:

"This order, including instructions and conditions on the reverse side hereof, shall constitute an agreement to cover the furnishing by you [Peterson] of all necessary tools and equipment, materials, labor and supervision (and including the costs of workmen's compensation and/or employer's liability insurance and all payroll taxes on such labor) to perform work as follows:

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"It is Shell's intent to establish a 'general and special employment relationship' whereby the contractor [Peterson] remains the general employer of its employees and Shell becomes their special employer . . . .

"1. Performance: Contractor shall diligently and carefully perform all work required hereunder in a good and workmanlike manner, shall

furnish all labor, supervision, machinery, materials, equipment and supplies necessary therefor and, if permitted to subcontract, shall be fully responsible for all work and services performed by subcontractors. Contractor shall conduct all operations in Contractor's own name as an independent contractor and not in the name of, or as agent for, Shell.

".    .    .    ..    .    .    .    .    .    .    .    .    .    .    .    .    ."

The purchase order was modified as follows:

"Applicable only with respect to contractor's performance of subject order within the State of California (but not to such performance elsewhere), the work contract conditions on the reverse side of subject order are revised as follows in order to clarify the employment relationship in the event Shell personnel exercise supervisory control over the manner and means in which contract employees perform their work in conjunction with this order:

"1. Change the last sentence of section 1 (performance) to read as follows:

" 'Contractor shall conduct all operations in contractor's own name and not in the name of, or as an agent for, Shell. The parties hereto hereby create a general and special employment relationship with respect to all labor furnished hereunder and Shell, as the special employer, hereby is given the right to fully control the details and means of doing the work hereby contracted for.'

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    ."

On November 12, 1973, Kowalski, a Peterson employee, was working on building a scaffold inside a large heater at the refinery with a crew of Peterson carpenters. While he was operating a radial saw furnished by Shell, Kowalski's hand was amputated.

On February 1, 1974, Kowalski filed a complaint against Shell and other defendants seeking damages for personal injuries. Shell denied the allegations in the complaint and asserted that Kowalski was its special employee so that his exclusive remedy was under the workers' compensation law.

The evidence presented at trial on the issue of special employment[1] showed that Shell closed down the various sections of the refinery on a rotating basis in order to make repairs and inspect all equipment and machinery. Each section of the refinery required such maintenance every one to two years. Each shutdown lasted from four to six weeks, with a shutdown beginning somewhere at the plant about once every six months. Shell regularly used Peterson to perform these maintenance operations.

Approximately two weeks before a shutdown, Peterson's general superintendent would move into the refinery and "through him we [Shell] make our wants known to Peterson." Prior to a shutdown, Shell would also prepare detailed lists of tasks to be performed by Peterson. These lists were then given to various Shell foremen, who would in turn convey the information to Peterson foremen. If Peterson employees were doing something which did not meet with Shell's approval, Shell would stop them and redirect their work. Shell could also request Peterson to remove an employee whose work Shell found unsatisfactory.

However, all Peterson employees were supervised directly by Peterson foremen. Peterson provided all the tools and equipment its employees used except for the saw Kowalski was using when he was injured. Peterson also provided its employees with hard hats and badges with the Peterson insignia. Peterson employees were authorized to enter the refinery through only one of the five or six entrances available to Shell employees.

At the time of the accident, Kowalski was on Peterson's payroll. He had been employed by Peterson for approximately two and a half months as a laborer and had worked at the refinery on a previous shutdown as well as on the present shutdown.[2] He was assigned to the Peterson carpentry crew and was under the direct supervision of Peterson's carpenter foreman. When he was injured, Kowalski was following the carpenter foreman's express orders. He was unaware of the contract between Shell and Peterson.

Peterson's carpenter foreman testified that Shell employees never directed him or the members of his crew as to the details of their work. Rather, Shell's involvement with his crew was limited to informing him

---

[1] Both parties also presented evidence on the issue of negligence and causation.

[2] The record also shows that Kowalski had previously been employed by Peterson from January to June, 1973, when he was laid off. However, he had not worked at Shell during this time.

of the location and size of scaffolds that were needed. Shell's carpenter foreman testified that he had no control over and never directed Kowalski as to the details of his work.[3] He also stated that he did not know of any Shell employee who had the right to direct Kowalski in the performance of his duties. The manager of Shell's safety department testified that "We didn't have no control over his [Kowalski's] work." Peterson's assistant superintendent also testified that Shell did not direct the details of Kowalski's work. There was no evidence presented to show that any Shell employee had directed the details of Kowalski's work.

The jury returned a special verdict, finding that Kowalski was *not* Shell's special employee, that his damages were $500,000, and that he had been 15 percent negligent.[4] However, the court granted Shell's motion for a judgment notwithstanding the verdict on the sole ground that Kowalski was Shell's special employee.[5] This appeal followed.

## II

The possibility of dual employment is well recognized in the case law. "Where an employer sends an employee to do work for another person, and both have the right to exercise certain powers of control over the employee, that employee may be held to have two employers—his original or 'general' employer and a second, the 'special' employer." (*Miller* v. *Long Beach Oil Dev. Co.* (1959) 167 Cal.App.2d 546, 549 [334 P.2d 695].) In *Industrial Ind. Exch.* v. *Ind. Acc. Com.* (1945) 26 Cal.2d 130, 134-135 [156 P.2d 926], this court stated that "an employee may at the same time be under a general and a special employer, and where, either

---

[3] R. E. Swearengin, Jr., Shell's carpenter foreman, in describing his relationship with Peterson's carpenter foreman, testified as follows:

"I would be given orders through my supervisors to build different scaffolds in various areas for work to be done, and then I would take him [Peterson's carpenter foreman] and show him the jobs and explain what we wanted, and then he would go to his men and do the work."

As to his relationship with Peterson's carpenters, Mr. Swearengin testified as follows:

"I would be walking by, and they might be having a problem, and I could talk to them about that. Or they could be building the scaffold in the wrong place, even, and I could tell them it's in the wrong area, or things of that nature."

[4] The jury also found that Shell had been 35 percent negligent and Peterson had been 50 percent negligent.

[5] Peterson and Shell also moved for a new trial, but that motion was denied. Shell appeals from the order denying a new trial.

by the terms of a contract or during the course of its performance, the employee of an independent contractor comes under the control and direction of the other party to the contract, a dual employment relation is held to exist. [Citations.]"

If general and special employment exist, "the injured workman can look to both employers for [workers'] compensation benefits. [Citations.] If workmen's compensation is available, it constitutes, with an exception not pertinent here, the workman's sole remedy against the employer. (Lab. Code, § 3601.)[6] Thus where there is dual employment the workman is barred from maintaining an action for damages against either employer." (*McFarland* v. *Voorheis-Trindle Co.* (1959) 52 Cal.2d 698, 702 [343 P.2d 923]; *Martin* v. *Phillips Petroleum Co.* (1974) 42 Cal.App.3d 916, 918 [117 Cal.Rptr. 269]; *Oxford* v. *Signal Oil & Gas Co.* (1970) 12 Cal.App.3d 403, 407-408 [90 Cal.Rptr. 700]; *Miller* v. *Long Beach Oil Dev. Co., supra,* 167 Cal.App.2d at p. 549.)

■ In determining whether a special employment relationship exists, the primary consideration is whether the special employer has " '[t]he right to control and direct the activities of the alleged employee or the manner and method in which the work is performed, whether exercised or not . . . .' " (*McFarland* v. *Voorheis-Trindle Co., supra,* 52 Cal.2d at p. 704.) However, "[w]hether the right to control existed or was exercised is generally a question of fact to be resolved from the reasonable inferences to be drawn from the circumstances shown. [Citations.] ■ And the existence or nonexistence of the special employment relationship barring the injured employee's action at law is generally a question reserved for the trier of fact." (*Miller* v. *Long Beach Oil Dev. Co., supra,* 167 Cal.App.2d at p. 550.)

In the present case, if there was substantial evidence to sustain the jury's finding that Kowalski was not Shell's special employee, the judgment notwithstanding the verdict must be reversed. ■ " '[A] motion for judgment [notwithstanding the verdict] may properly be granted "when, and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of

---

[6]Labor Code section 3601 provides in pertinent part: "(a) Where the conditions of compensation exist, the right to recover such compensation, pursuant to the provisions of this division is, except as provided in Section 3706, the exclusive remedy for injury or death of an employee against the employer . . . ."

sufficient substantiality to support a verdict in favor of the plaintiff." [Citation.]' " (*McFarland* v. *Voorheis-Trindle Co., supra,* 52 Cal.2d at p. 703.)

In the present case, Shell and the trial court relied on the Shell-Peterson contract. They assert it made Kowalski Shell's special employee since the contract expressly stated that Shell had the right to control and direct Kowalski's work.[7] ▮ Although the terms of a contract may specify that a special employer retains the right to control the details of an individual's work or purports to establish an employment relationship, "the terminology used in an agreement is not conclusive . . . even in the absence of fraud or mistake." (*Tieberg* v. *Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 952 [88 Cal.Rptr. 175, 471 P.2d 975], citing *Bartels* v. *Birmingham* (1947) 332 U.S. 126 [91 L.Ed. 1947, 67 S.Ct. 1547, 172 A.L.R. 317]; accord *Mark Hopkins Inc.* v. *Cal. Emp. etc. Com.* (1948) 86 Cal.App.2d 15, 18 [193 P.2d 792]; *Stewart & Nuss* v. *Ind. Acc. Com.* (1942) 55 Cal.App.2d 501, 506 [130 P.2d 985]; *Luckie* v. *Diamond Coal Co.* (1919) 41 Cal.App. 468, 479 [183 P. 178].) "The contract cannot affect the true relationship of the parties to it. Nor can it place an employee in a different position from that which he actually held." (*Martin* v. *Phillips Petroleum Co., supra,* 42 Cal.App.3d at p. 919.)

▮ Since a contract is not conclusive evidence of the existence of the right to control, the courts have looked to a number of factors as evidentiary indicia of the existence of a special employment relationship. "The paramount consideration appears to be whether the alleged special employer exercises control over the details of [an employee's] work. Such control strongly supports the inference that a special employment exists." (*McFarland* v. *Voorheis-Trindle Co., supra,* 52 Cal.2d at p. 705; *Oxford* v. *Signal Oil & Gas Co., supra,* 12 Cal.App.3d at p. 408; *Martin* v. *Phillips*

---

[7]The Shell-Peterson contract is subject to different interpretations. Although the contract purports to establish a special employment relationship vis-à-vis Shell and Peterson employees by giving Shell the right to control the details of the work of Peterson employees, it also vests all supervision of Peterson employees in Peterson. A further ambiguity is added by the terms of the contract which state that the revisions in the contract are made "in order to clarify the employment relationship *in the event* Shell personnel exercise supervisory control over the manner and means in which contract employees perform their work . . . ." From the entire contract, the jury may well have inferred that the special employment relationship would arise only if Shell actually exercised supervisory control of Peterson employees.

*Petroleum Co., supra,* 42 Cal.App.3d at p. 922.)[8] However, "[t]he fact that instructions are given as to the result to be achieved does not require the conclusion that a special employment relationship exists." (*McFarland v. Voorheis-Trindle Co., supra,* 52 Cal.2d at p. 704; *Umsted v. Scofield Eng. Const. Co.* (1928) 203 Cal. 224, 230 [263 P. 799].)

Evidence that the alleged special employer has the power to discharge a worker "is strong evidence of the existence of a special employment relationship.[9] [Citations.] The payment of wages is not, however, determinative." (*McFarland v. Voorheis-Trindle Co., supra,* 52 Cal.2d at p. 705.) Other factors to be taken into consideration are "the nature of the services, whether skilled or unskilled, whether the work is part of the employer's regular business, the duration of the employment period, . . . and who supplies the work tools." (*Oxford v. Signal Oil & Gas Co., supra,* 12 Cal.App.3d at p. 408; *Martin v. Phillips Petroleum Co., supra,* 42 Cal.App.3d at pp. 921-922.) Evidence that (1) the employee provides unskilled labor, (2) the work he performs is part of the employer's regular business, (3) the employment period is lengthy, and (4) the employer provides the tools and equipment used, tends to indicate the existence of special employment. Conversely, evidence to the contrary negates existence of a special employment relationship.

[8]In *McFarland,* this court concluded that the jury's finding of no special employment was supported by substantial evidence that the defendant had not exercised any control over the details of the plaintiff's work and thus that the trial court had erred in granting the judgment notwithstanding the verdict. Both *Martin* and *Oxford* involved contracts denying the existence of special employment. Nevertheless, the judgments in favor of the special employers were affirmed since there was substantial evidence that the special employers had exercised control as to the details of the plaintiffs' work.

[9]Both *Oxford v. Signal Oil & Gas Co., supra,* 12 Cal.App.3d at page 410, and *Martin v. Phillips Petroleum Co., supra,* 42 Cal.App.3d at page 922, relying on *Sehrt v. Howard* (1960) 187 Cal.App.2d 739, 743 [10 Cal.Rptr. 128], state that it is the power to terminate the special employment relationship and not the power to discharge an employee that is important. However, *Sehrt* does not stand for that proposition since the actual exercise of control was found to be the determining factor for establishing the existence of a special employment relationship. "Clearly, when a master lends his servant to another, the servant goes to the other at the direction of the master. In such a situation the master has residuary control. He can recall the servant at will; he can discharge the servant or give him other orders. But this is not the test of special employment. The test is whether the special employer has the right to control the details of the work for which the employee was loaned." (*Id.,* at p. 743.) *McFarland* considered the fact that the alleged employer could have a worker removed, but not discharged, as indicating the nonexistence of special employment. (See, e.g., *Miller v. Long Beach Dev. Co., supra,* 167 Cal.App.2d at p. 554; *Doty v. Lacey* (1952) 114 Cal.App.2d 73, 79 [249 P.2d 550].)

Moreover, that an alleged special employer can have an employee removed from the job site does not necessarily indicate the existence of a special employment relationship. Anyone who has the employees of an independent contractor working on his premises could, if dissatisfied with an employee, have the employee removed. Yet, the ability to do

In addition, consideration must be given to whether the worker consented to the employment relationship, either expressly or impliedly,[10] and to whether the parties believed they were creating the employer-employee relationship. (*Martin* v. *Phillips Petroleum Co., supra,* 42 Cal.App.3d at pp. 920 and 922.)

■ In the present case, the uncontradicted evidence shows that Shell did not exercise any control over Kowalski's duties. He was at all times under the direct supervision of Peterson's carpenter foreman. Shell's carpenter foreman, the person most likely to have the authority to direct the details of Kowalski's work, testified that he had no such right, had never supervised Kowalski, and did not know of any Shell employee who did. Shell's carpenter foreman and the manager of its safety department, as well as Peterson's carpenter foreman, testified that Shell's involvement with Peterson's carpentry crew was limited to the giving of instructions as to the size and locations of scaffolds needed by Shell.

Shell's maintenance manager testified that Shell conveyed its instructions as to what work was to be done either through Peterson's general superintendent or crew foremen. However, the jury could have inferred that these were general instructions "as to the result to be achieved [which] does not require a conclusion that a special employment relationship exists." (*McFarland* v. *Voorheis-Trindle Co., supra,* 52 Cal.2d at p. 704.) Although Kowalski's work as a laborer was relatively unskilled and easily subjected to Shell's control, no such control was exercised.

Other evidence also supports the jury's finding. Kowalski was on Peterson's payroll. He was not permanently assigned to Shell. Although Kowalski had worked on the Shell premises for approximately two and a

so would not make the employees of the independent contractor the special employees of the party receiving the services. To the extent that *Oxford* v. *Signal Oil & Gas Co., supra,* 12 Cal.App.3d 403, and *Martin* v. *Phillips Petroleum Co., supra,* 42 Cal.App.3d 916, are in conflict with *McFarland* and this opinion, they are disapproved.

[10]In 1A Larson, Workmen's Compensation Law, section 48.10, pages 8-205-8-206, the author states: "If this question cannot be answered 'yes,' the investigation is closed, and there is no need to go on into the tests of relative control and the like. [¶] This must necessarily be so, since the employee loses certain rights along with those he gains when he strikes up a new employment relation. Most important of all, he loses the right to sue the special employer at common law for negligence; and when the question has been presented in this form, the courts have usually been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit."

half months, the record also shows that Kowalski had worked elsewhere from January to June, 1973.[11] Peterson provided all tools and equipment, with the exception of the saw, as well as the hard hats and badges with the Peterson insignia. Although Shell could ask Peterson to remove an employee from the job, Shell did not have the power to terminate Kowalski's employment with Peterson.

Moreover, Kowalski was unaware of the contract between Shell and Peterson. He did not expressly agree to an employment relationship with Shell and the facts do not indicate that he impliedly consented to the employment relationship. Contrary to *Martin* v. *Phillips Petroleum Co.,* *supra,* 42 Cal.App.3d at page 920, where consent was inferred "from [the employee's] acceptance of the special employer's control and direction. . .," no control as to the details of Kowalski's work was exercised by Shell. In addition, Kowalski believed his only employment relationship was with Peterson. It cannot be said that Kowalski believed an employer-employee relationship had been created because he "was aware . . . that his day by day and hour by hour work was under the direction of [the special employer]." (*Id.,* at p. 922.)

### III

Since there was substantial evidence to support the jury's finding that Kowalski was not Shell's special employee, the trial court erred in granting the judgment notwithstanding the verdict. Therefore, that judgment is reversed and the trial court is directed to enter judgment for plaintiff.

Tobriner, J., Mosk, J., Clark, J., Richardson, J., Manuel, J., and Newman, J., concurred.

Respondent's petition for a rehearing was denied February 28, 1979, and the opinion was modified to read as printed above.

---

[11]Compare *Oxford, supra,* 12 Cal.App.3d 403 and *Martin, supra,* 42 Cal.App.3d 916 where the employees had been permanently assigned to the special employer and had continuously worked there from one to four years.