The plaintiff, James Means, appeals from a summary judgment in favor of defendants International Systems, Inc. ("I.S.I."), Larry Bridges, Jerry West, and Robert Wilson. We affirm in part, reverse in part, and remand.
The issues are (1) whether Means, admittedly an employee of Long's Temporary Services ("Long's"), is, for workmen's compensation purposes, also an employee of I.S.I. and (2) whether Means presented evidence to create a genuine issue of material fact as to the alleged "willful conduct" on the part of defendant co-employee Wilson, who caused him to be injured on the job.
 FACTS
In October 1987, Means signed a contract with Long's Personnel Services, Inc. The contract provided in part as follows:
 "I [Means] . . . hereby retain the services of Long's Personnel Services, Inc., hereinafter referred to [as] Agency, to assist me in obtaining employment. . . .
 "Upon acceptance of employment obtained through information directly or indirectly furnished me by said Agency, I agree to pay a fee. . . .
". . . .
 "D. Should I work for Long's Temporary Service, division of the Agency, on the Agency's temporary payroll, I understand that there will be no fee. Should I accept a permanent position with the Agency's client within one year after last *Page 143 
day of temporary employment, I agree to pay the full fee . . . regardless of any prior application I may have with the Agency's client. I agree for 12 months not to accept temporary work through another contractor with a company for which I have worked through Long's Temporary."
 "E. Acceptance means agreement by me with an employer to commence work."
Means began work for Long's.[1] Long's had a company policy that "no employee will handle money, funds, checks, keys, etc. or drive any vehicle without notification and approval of Long's." Failure to observe all safety rules or to wear appropriate safety equipment was stated to be good cause for termination. Means was obliged to abide by the employee conduct policy of each establishment where he was assigned. Employment was said to be "strictly temporary in nature"; Long's would request Means's services on a regular and/or irregular basis "based on the convenience of [Long's] and a standard of production as set by the client." If the client offered Means a permanent position, Long's would (1) ask the client to keep Means on the Long's temporary payroll until the placement fee was satisfied; or (2) if the client refused to do that, ask the client to pay a permanent placement fee; or (3) if Means accepted the position and the client refused to pay, require Means to pay the placement fee.
On November 3, 1987, Means was assigned to work for I.S.I. as a concrete finisher. Means punched a time card supplied by I.S.I. and drove directly to the jobsite each morning and directly home after work. Means supplied his own tools for the job. Means did not work for any other Long's clients until he left the job due to injury. I.S.I. paid Long's a "bill rate" of $7.90 per hour for Means's services. In turn, Means received $5.00 per hour from Long's. Long's applied the "margin" of $2.90 to profit and overhead, which included the purchase of workmen's compensation insurance for its employees.[2] There is no evidence in the record that I.S.I. had purchased a separate workmen's compensation insurance policy for Means.
On the day of the injury, defendant Larry Bridges was the job superintendent, and defendant Jerry West was the foreman of the crew on which Means was working. Defendant Robert Wilson was employed by I.S.I. as a concrete finisher and crane operator and was working with Means that day. Means was injured when an 800-pound steel bucket, partially filled with concrete, struck him from behind as he was pouring and finishing concrete into forms. The bucket was suspended by a crane, operated by Wilson, and was used to pour the concrete into the forms. The blow from the bucket caused a serious injury to Means's elbow, including substantial nerve damage and partial loss of the use of three fingers of his hand.
On February 9, 1988, Means sued I.S.I., Bridges, West, and Wilson, alleging that he was injured by the intentional act of Wilson, an employee of I.S.I.[3] Means claims that the alleged "willful conduct" on Wilson's part arose out of an incident that occurred earlier at the jobsite when Means refused to reveal his rate of pay to Wilson. Means claimed that Wilson became "agitated" when Means would not tell him how much money he was making. Means alleged that because of this incident, Wilson intentionally directed the bucket of concrete with the crane so that the bucket hit him.
Wilson testified at his deposition that he saw Means and that he was moving the bucket backwards in Means's direction because Ollie Ezell (an I.S.I. supervisor over *Page 144 
the concrete finishers) had told him to move the bucket back to pour some more concrete into another part of the form. Wilson testified he did not actually see the bucket hit Means, and he admitted that he had earlier asked Means about how much money he was making. Means testified at his deposition as follows:
 "Q: Let me just ask you a couple of questions in reference to whether or not Mr. Wilson intended to hurt you that day. Had there been any problems on the jobsite with Mr. Wilson in reference to discussions of wages?
 "A: Oh yeah. He discussed wages with everybody. He wanted to know what was everybody making on the job.
"Q: Did he approach you, also?
"A: Yes.
"Q: Okay. And what did you tell him?
"A: I told him that wasn't his concern.
 "Q: Okay. And after that, was there some discussion between someone in management, a foreman or someone, advising all the employees that discussion of wages was not to be carried on?
"A: Right. That was Larry Bridges.
 "Q: Told all the crew members that what each person made was of no concern to anybody else?
 "A: That's right. Mr. Bridges called everybody to the side because he got word of somebody questioning everybody about wages. And he called everybody to the side, and told them that was against company policy to discuss wages between employees.
"Q: Okay.
 "A: And the very next time that he hear it, he would immediately dismiss them. He told them. He said, I know who it is. He said, I'm not going to call names. You know who it is. But if it happens again, he said, you'll go out the door.
 "Q: And you had told Mr. Wilson, prior to that, that you were not going to tell him what you were making.
 "A: That's right. I told him it wasn't his business, wasn't his concern about what I was making.
"Q: Did he seem happy with that?
"A: No, he didn't."
". . . .
 "Q: . . . But, for the purposes of your complaint and what we call pleadings which are what you're telling the Court happened, is it your contention that Mr. Wilson intentionally caused the bucket to strike you?
"A: That, I don't know.
 "Q: So, whether it was an accident or intentional you have no idea of that.
"A: It was carelessness.
"Q: Okay.
"A: It was complete carelessness.
 "Q: You're stating that as if you know it to be fact. Are you also stating as a matter of fact that it was not an intentional act?
 "A: Now that, I don't know. I can't say whether he hit me intentional [sic] with that bucket or what because he know I was inside that slab. He knew I was inside that slab. He may have not been intending to bring that bucket that far. But, I do know for a fact he and the rest of those guys knew that I was inside that slab, working. And only thing he had to do was warn me. Hey, we bringing the bucket back. We backing the bucket up. Then, I would have stepped out of his way.
 "Q: But, at the time the bucket was backing up, you were the only worker inside the slab.
"A: The only one.
 "Q: And you mentioned that someone commented: we need more concrete at a particular point. That was Ollie Ezell?
"A: I did not hear that.
"Q: Okay. I'm sorry.
 "A: This is what Wilson told me after I hit the bucket. I asked him, why did he back the bucket up. He said, Pop [Ollie Ezell] said we needed more concrete. I did not hear that statement."
Thomas Damson, president of Long's Personnel Services, Inc., testified at his deposition concerning Means's employment as follows: *Page 145 
 "A: In general terms, we tailor our services to a client's needs. There are cases where we provide supervisors that direct the day-to-day activity and job functions of our employees and they supervise our employees. It literally depends on what the requirements of the employer/client of ours demands.
 "This happened to be what would typically be a temporary help scenario. The client calls up, supply somebody to carry out a function, when the project is through they release our employee, and we bring him back and hopefully put him to work somewhere else. . . .
". . . .
 "A: . . . . We are involved in the supplying of human resources. And we basically do it in two different ways. We think in terms of two different operational divisions. We are, on the one hand, a private employment agency. We do search and placement of individuals for companies. We do that on a fee basis, contingency fee basis. We find applicants and they are hired by our clients. The other area of our business is as temporary help contractors. We recruit employees and we assign them to work at our clients' premises.
". . . .
 "Q: . . . . Did Mr. Means agree to go and work for International Systems?
 "A: Yes, he agreed to go. We have had other people working here on cement finishing there, I believe, prior to that as well.
 "Q: But Mr. Means had the choice. He could either go to work for International Systems or not?
 "A: Yes, he could have turned down the assignment; that is correct.
"Q: And, go ahead.
 "A: This may come up later, I believe we ran an ad in the newspaper, and I believe he answered the ad. I don't believe he was — I don't believe he would be like a laborer where we would have an abundance of them. This was a special skill and we had to advertise. I believe we used everybody we had, and he answered the ad."
The trial court entered "summary judgment . . . in favor of all defendants on all claims made by [Means]" based on the pleadings, affidavits, and deposition testimony. Means appealed.
Means argues that the only contract of hire was between Means and Long's and that without a contractual relationship between Means and I.S.I. there is no "special employer" relationship. Means argues further that I.S.I. did not train him and that he had his own tools for the temporary assignment to I.S.I., and, therefore, that I.S.I. is not immune from tort liability under the Workmen's Compensation Act. I.S.I. argues that it was the "special employer" of Means because (1) Means had a contract of hire, express or implied, with I.S.I.; (2) the work Means performed was essentially that of I.S.I.; and (3) I.S.I. had the right to control the details of Means's work. I.S.I. argues further that there was no evidence of "willful conduct" on the part of Wilson and that it is immune from tort liability under the Workmen's Compensation Act.
 I.
In support of its arguments that Means was its employee, I.S.I. relies on Terry v. Read Steel Products, 430 So.2d 862
(Ala. 1983), in which this Court adopted the criteria for determining whether a loaned employee is a special employee of an employer under the Workmen's Compensation Act. The Court stated:
 " 'When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if
 " '(a) the employee has made a contract of hire, express or implied, with the special employer;
 " '(b) the work being done is essentially that of the special employer; and
 " '(c) the special employer has the right to control the details of the work.
 " 'When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmen's compensation.' " *Page 146 
Id., at 865 (quoting 1C A. Larson, The Law of Workmen'sCompensation, § 48 (1980)). See also Marlow v. Mid South ToolCo., 535 So.2d 120, 123 (Ala. 1988); Bechtel v. Crown CentralPetroleum Corp., 495 So.2d 1052, 1055 (Ala. 1986); and Pettawayv. Mobile Paint Mfg. Co., 467 So.2d 228, 229 (Ala. 1985). I.S.I. argues that all three conditions are satisfied in this case. We agree. The dispositive facts of this case are indistinguishable from those presented in Terry, Pettaway,Bechtel, and Marlow, supra. In each of those cases, this Court upheld the defendant's summary judgment "on the basis that the defendant was a special employer entitled to statutory immunity." See, e.g., Bechtel, supra, at 1055. Therefore, based on this line of cases, we conclude that Means is also a "special employee" of I.S.I., and we hold that under the Workmen's Compensation Act I.S.I. is immune from tort liability. Accordingly, we conclude that defendants Larry Bridges and Jerry West are immune from tort liability because Means does not allege that his injuries were caused by "willful conduct" on the part of these defendants. The summary judgment insofar as it is in favor of I.S.I., Bridges, and West is therefore affirmed.
 II.
Under the Alabama Workmen's Compensation Act, an injured employee may bring an action against a co-employee to recover damages for injuries sustained on the job under circumstances amounting to "willful conduct," on the part of the co-employee. Code 1975, § 25-5-11(a) and (b). "Willful conduct," as applicable to the facts of this case, is defined as "[a] purpose or intent or design to injure another; and where a person, with knowledge of the danger or peril to another consciously pursues a course of conduct with a design, intent and purpose of inflicting injury, then he is guilty of 'willful conduct.' " § 25-5-11(c)(1).
Viewed in a light most favorable to the plaintiff, the evidence indicates that Means had a confrontation with Wilson at work, and that evidence creates a genuine issue of material fact as to whether Wilson's actions amounted to "willful conduct." Means testified as follows in his affidavit submitted in opposition to the defendants' motion for summary judgment:
 "Mr. Wilson has admitted that he saw me and yet did not try to either warn me or to stop the bucket to allow me to get out of the way before it hit me. After I was hit I got the impression that Mr. Wilson was not upset at having injured me and it is my belief that Robert Wilson intended to hit me with the bucket as he did."
Means's affidavit is not totally inconsistent with his deposition testimony regarding the issue of "willful conduct." Means's testimony does not conclusively negate the existence of any genuine issue of material fact. See Robinson v. HankRoberts, Inc., 514 So.2d 958, 961 (Ala. 1987). Therefore, the question of whether Wilson hit Means with the bucket as a result of "willful conduct" is a question for the trier of fact. Accordingly, we reverse the summary judgment insofar as it is in favor of Wilson and remand this cause for further proceedings not inconsistent with this opinion.
Therefore, the judgment is affirmed in part, and reversed in part and the cause is remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and JONES, SHORES and HOUSTON, JJ., concur.
[1] Long's is a division of Long's Personnel Services, Inc.
[2] The record contains a document listing the insurance policies, including workmen's compensation insurance, issued to Long's Personnel Services, Inc., which names Long's as the "insured." I.S.I. is listed as the "certificate holder."
[3] Because the incident occurred after June 11, 1987, the "substantial evidence" rule, as codified in Code 1975, §12-21-12 (Cum.Supp. 1988), applies.