Compensation Appeals Board
No. 92-442

APPEAL OF LONGCHAMPS ELECTRIC, INC. & a.
(New Hampshire Department of Labor Compensation
Appeals Board)

November 30, 1993

*Devine, Millimet & Branch, P.A.*, of Manchester (*Douglas N. Steere* on the brief and orally), for Longchamps Electric, Inc. and Hanover Insurance Co.

*Abramson, Reis & Brown*, of Manchester (*Kenneth C. Brown* on the brief and orally), for Thomas Pratte.

*Ouellette, Hallisey, Dibble and Tanguay, P.A.*, of Dover (*Stephen J. Dibble* on the brief and orally), for Aetna Life & Casualty.

THAYER, J.  Longchamps Electric, Inc. (Longchamps) and its insurer, Hanover Insurance Co., appeal the decision of the compensation appeals board (board) that Thomas Pratte was an employee of Longchamps at the time of his work-related injury and is thus entitled to workers' compensation benefits from Longchamps' insurer. Longchamps argues that the board incorrectly applied the borrowed servant doctrine in determining that Pratte was its employee, and not the servant of Mikol Electrical Services and Controls Corp. (Mikol), at the time of the injury. For the following reasons, we affirm.

The facts of this case are largely uncontroverted. On February 10, 1988, Longchamps, which was experiencing a slow-down in its work, entered into an agreement to supply electricians' services to Mikol at a Massachusetts work site. Pratte, an apprentice electrician of two years experience, was in the general employ of Longchamps at that time. One evening Pratte was told to bring his hand tools and to report an hour earlier than usual to the Longchamps shop the next day because there would be an hour drive to the work site. When he arrived at the shop, he was told that he would be working at a Mikol site in Massachusetts. Each morning until the time of his accident, Pratte and the other Longchamps employees assigned to this job would report to the Longchamps shop and drive to the Mikol site in the Longchamps company van.

As an apprentice, Pratte was required to work with a licensed master electrician. At the Mikol site, the master with whom Pratte worked was always another Longchamps employee. Pratte was never watched or instructed by a Mikol employee concerning the

manner in which he conducted his work. The Longchamps employees were in fact unsure as to whether there were any licensed electricians from Mikol on the site at any time. Mikol provided the supplies and wires to be installed at the site, and a Mikol representative gave the Longchamps crew a daily agenda each morning. Beyond that, Mikol provided very little if any supervision of the job site. The Longchamps electricians themselves determined the manner in which their tasks were to be completed.

Longchamps continued to pay Pratte his customary hourly wage based upon Longchamps' timecards that Pratte filled out at the Mikol site. In turn, Longchamps submitted bills, charging Mikol an hourly rate for these employees that represented the wages paid as well as overhead, amounts for workers' compensation premiums, FICA payments and profit. The rate charged was analogous to that charged by Longchamps in its own bid jobs.

The board determined that there was no contract of hire between Mikol and Pratte, either expressed or implied, which would alter his employment status for the purposes of workers' compensation insurance. It based this determination on Pratte's lack of consent to any employment by Mikol, and on Mikol's lack of control over the details of Pratte's work at the site. Longchamps argues that the board's decision should be reversed because it failed to consider all of the relevant factors under *LaVallie v. Simplex Wire & Cable Co.*, 135 N.H. 692, 609 A.2d 1216 (1992), and that if these factors had been considered, the board would have found Pratte to be the servant of Mikol. We disagree.

■ We do not overturn agency decisions or orders, absent an error of law, "unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable." RSA 541:13 (1974); *Appeal of Nolan*, 134 N.H. 723, 727–28, 599 A.2d 112, 115 (1991). Such is not the case here.

■ As we recently held in *LaVallie*, we determine the existence of an employee-employer relationship for the purposes of workers' compensation through reference to the factors set forth in the New Hampshire Department of Labor regulations. *LaVallie*, 135 N.H. at 695, 609 A.2d at 1218. In the instant case, the parties agree that these factors govern the existence of any employment relationship between Pratte and Mikol:

> "'In determining whether a person acting for another is an employee . . . all relevant factors shall be considered including, but not limited to the following:

a. The extent of control which, by the agreement, the employer may exercise over the details of the work.

b. Whether or not the person performing a service is engaged in a distinct occupation or business.

c. The kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision.

d. The skill required in the particular occupation.

e. Whether the employer or the worker supplies the instrumentalities, tools and the place of work for the person doing the work.

f. The method of payment, whether by the time, or by the job.

g. Whether or not the work is a part of the regular business of the employer.

h. The nature of the relationship that the parties believe they are creating.

i. Whether the person doing the work can be summarily discharged by the employer with a right to no more than wages already earned.'"

*LaVallie*, 135 N.H. at 695–96, 609 A.2d at 1218 (quoting N.H. ADMIN. RULES, Lab 104.02 (expired Jan. 6, 1989) (current version at N.H. ADMIN. RULES, Lab 101.05 (1991)).

The board made factual findings relevant to several of the factors: control over the details of Pratte's work, supervision of the work, the supply of the requisite tools, and the parties' beliefs. Additionally, after considering the testimony presented to it, the board found that Pratte had not consented to an employment relationship with Mikol such that the workers' compensation statute would come into play. In considering consent as a factor, the board relied on the writings of the leading commentator in the field, Professor Arthur Larson, whose treatise notes that "[t]here can be no compensation liability in the absence of a contract of hire between the employee and the borrowing employer." 1C A. LARSON, THE LAW OF WORKMEN'S COMPENSATION § 48.11, at 8–405 to 8–406 (1990). In a situation such as the instant one, where the issue is not whether the injured employee will recover at all, but rather which of the involved insurers will pay such coverage, Professor Larson advocates as a threshold requirement for borrowed servant status the consent of the employee to the new employment relationship:

"This must necessarily be so, since the employee loses certain rights along with those he gains when he strikes up a new employment relation. Most important of all, he loses the right to sue the special employer at common law for negligence; and when the question has been presented in this form, the courts have usually been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit."

LARSON, *supra* § 48.12, at 8–409 to 8–410; *see also Bourette v. Dresser Industries, Inc.*, 481 A.2d 170, 173 (Me. 1984). Pratte urges that we adopt this focus in viewing employment relationships.

We did not specifically address the importance of employee consent to the existence of an employment relationship in *LaVallie* because the facts of that case did not require it. In *LaVallie*, the lending employer was in the business of supplying short-term labor to other businesses. Under those circumstances, the lent-employee would generally be aware of, and impliedly consent to, a variety of new employment relationships. *See Vanterpool v. Hess Oil V.I. Corp.*, 766 F.2d 117, 127–28 (3rd Cir. 1985); *Maynard v. Kenova Chemical Co.*, 626 F.2d 359, 362 (4th Cir. 1980); *Means v. International Systems, Inc.*, 555 So. 2d 142, 145–46 (Ala. 1989); *Lindsey v. Bucyrus-Erie*, 778 P.2d 1353, 1355 (Ariz. App. 1989); LARSON, *supra* § 48.23, at 8–488 to 8–489 ("employers obtaining workers from the kind of labor service typified by Manpower, Inc. have usually, but not invariably, been held to assume the status of special employer" (footnotes omitted)).

The department of labor regulations, as cited in *LaVallie*, note specifically that the relevant factors include, but are "not limited to" the nine listed. Thus, we do not abrogate *LaVallie* in determining that, in the situation here presented, consent of the employee to a new employment relationship should be considered as an additional factor in determining whether an employment relationship exists with a borrowing employer for the purposes of the workers' compensation laws.

The circumstances of this case do not warrant a finding that Mikol became the special employer of Pratte. As noted above, the board made factual findings relevant to four of the nine factors set out in the regulations cited in *LaVallie* in deciding that Pratte had not entered into a new employment relationship with Mikol: control over the details of employment, the need or fact of supervision over the

work done, the supply of necessary tools, and the parties' beliefs as to the status of the employment relationship. The evidence relating to each of these factors supports the board's determination that no employment relationship existed between Pratte and Mikol. Additionally, the evidence relating to two other factors, skill and the right of discharge, provides further support for the board's findings.

This case is factually similar to *Kowalski v. Shell Oil Co.*, 23 Cal. 3d 168, 588 P.2d 811, 151 Cal. Rptr. 671 (1979), where, based upon a "control test" utilizing factors similar to those articulated in *LaVallie*, the court found that the plaintiff was not the special employee of Shell: the plaintiff was at all times under the control and supervision of the general employer's foreman who directed the details of the plaintiff's work based upon only general instructions given by a representative of Shell; the plaintiff was not permanently assigned to Shell; the general employer provided most of the necessary equipment; and only the general employer had the right to terminate the plaintiff. *Id.* at 178–79, 588 P.2d at 817, 151 Cal. Rptr. at 677. Additionally, the court found no express or implied contract between the parties, noting that there was no showing that the employee had consented to control of the details of his work by Shell, and that the employee believed that his only employment relationship was with the general employer. *Id.* at 179, 588 P.2d at 817–18, 151 Cal. Rptr. at 677–78.

In the instant case, similarly, Mikol did not exert control over Pratte or the details of his work. It provided little more than a daily agenda to the Longchamps crew whose master electricians themselves determined the manner in which they would complete the tasks set out. Pratte was never given direct instructions by a Mikol representative; he instead worked under the instructions of Longchamps' master electricians. *Cf. Barajas v. USA Petroleum Corp.*, 184 Cal. App. 3d 974, 984, 229 Cal. Rptr. 513, 518 (1986) (naked right to control does not compel conclusion of special employment where no actual control existed). Further, Pratte supplied his own hand tools, and while the board found that Mikol would have supplied any large tools needed, the evidence showed that such tools were not in fact required because the work done by the Longchamps crew was mainly "finish work" which required only hand tools for completion. Pratte did not report individually to Mikol each morning. Rather, he reported to the Longchamps shop where he, along with others, rode to the Mikol site in a Longchamps van. There is no showing that Mikol could have terminated Pratte's employment, particularly given that Mikol did not contract for Pratte's or any other individ-

ual's services in particular, but rather for the services of a Long-champs electrical crew.

The factors that address the skill level required and the level of supervision generally provided for the type of work involved also favor a finding that Mikol did not become the special employer of Pratte. *See generally* RESTATEMENT (SECOND) OF AGENCY § 220 comments h and i (1958). An electrician's job requires significant skill and, as in this case, is the type of work generally subcontracted out. Moreover, while an electrician's job is a skilled one, Pratte, as an apprentice, could not legally work without the direct supervision that was provided by Longchamps employees at the site, the same supervision that would have been provided had Longchamps itself been the subcontractor at the site.

Finally, the belief-of-the-parties factor strongly supports the board's determination. From Pratte's perspective, as the board found, "there was no change in his employment situation." He worked with the same men, rode in the same van, reported to the same shop, responded to the same authority, and received the same paycheck. He also testified that, based upon his opinion of Mikol, he would not have worked directly for Mikol.

■ Moreover, Pratte did not expressly agree to an employment relationship with Mikol, and the facts do not indicate that he impliedly consented to the employment relationship. This is not a case in which an employee might be held to have impliedly consented to an employment relationship by accepting the special employer's control and direction. *See* LARSON, *supra* § 48.15, at 8–428 to 8–434. Rather, no control as to the details of Pratte's work was exercised by Mikol. Based upon the facts of the case at hand, we cannot say that the board erred as a matter of law or was unjust or unreasonable in finding that Pratte did not actually or impliedly contract with Mikol and, therefore, that no employment relationship arose between them.

*Affirmed.*

All concurred.