Peggy **COCKRELL and the Estate of Gary Cockrell, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Newell Netsch, Elizabeth Netsch, and the Estate of Lisa Netsch, Plaintiffs,**

v.

**United States of America, Defendant.**

**Nos. 97 CV 0281B(AJB), 97 CV 0350B(AJB).**

United States District Court, S.D. California.

Aug. 3, 1999.

---

Don Alan Ernst, San Luis Obispo, CA, James P. Tessier, Menlo Park, CA, Marguerite I Delbourgo, Costa Mesa, CA, for plaintiff.

U.S. Attorney CV, San Diego, CA, Fernando Campoamor, Washington, DC, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BREWSTER, Senior District Judge.

### I. INTRODUCTION

This case arises out of a mid-air collision between two aircraft approaching Ramona Airport, in San Diego County, California, on June 21, 1995. Both aircraft were returning to Ramona after being released from fire suppression activities over the "Butterfield fire."

Gary Cockrell, Lisa Netsch and Michael Smith were killed as a result of the accident. Gary Cockrell and Lisa Netsch, employed by Aero Union Corporation, were the pilot and co-pilot of the DC–4 air tanker aircraft, known as "Tanker 19". Michael Smith, also killed, was a United States Forest Service lead plane pilot of the twin-engine Beech Baron, known as "Lead 5–6".

Plaintiffs Peggy Cockrell and the Estate of Gary Cockrell, and Plaintiffs Newell Netsch, Elizabeth Netsch, and the Estate of Lisa Netsch, filed wrongful death ac-

tions under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), against Defendant United States of America, the United States Forest Service and Michael Smith. The cases were filed separately in the United States District Court for the Central District of California. Pursuant to the Federal Employees Liability Reform and Tort Compensation Act, 28 U.S.C. § 2679, the parties stipulated in each lawsuit that Michael Smith was acting within the course and scope of his employment with the USFS at the time of the subject accident. Upon filing the stipulations with the Court, both Michael Smith and the USFS were dismissed as defendants, leaving the United States as the sole defendant in each case.

By stipulation of the parties, the actions were consolidated for purposes of discovery and trial and transferred to the Southern District.

As a result of additional stipulations between the U.S. and Plaintiffs, the only issues remaining for trial in these consolidated actions were: 1) the "special employment" defense and 2) damages. The U.S. admitted liability for causing the deaths of Gary Cockrell and Lisa Netsch, and stipulated that the amount of economic damages suffered by Plaintiff Peggy Cockrell is $1,866,112.00.

Trial of the consolidated actions was bifurcated. The first phase of trial was limited to adjudication of the special employment defense. The bench trial took place over the course of six trial days between December 8 and December 17, 1998. Post-trial closing briefs were submitted by the parties on January 22, 1999.

On April 20, 1999, this Court issued its Memorandum and Decision, deciding the issue in favor of Plaintiffs and against Defendant United States. The Court determined that the U.S. was not the special employer of Plaintiffs' decedents, Gary Cockrell and Lisa Netsch.

The Court's Decision is based on the following findings of fact and conclusions of law. These findings of fact and conclusions of law are based on the evidence and reasonable inferences which the Court draws from that evidence.

## II. FINDINGS OF FACT

### A. The Circumstances Surrounding The Accident

1. The Butterfield fire started on June 19, 1995, two days before the accident. Substantial air tanker and other aircraft operations from the Ramona air tanker base in support of this fire had been occurring and could be expected to continue.

2. On the second day of the Butterfield Fire, June 20, 1995, a joint Incident Command System ("ICS") was established, consisting of both California Department of Forestry ("CDF") and United States Forest Service ("USFS") personnel. (RT, IV–205:20 to 206:25.) An ICS is the fire-specific management hierarchy controlling the various resources, i.e., personnel and equipment, deployed to combat a large fire. The portion of the ICS controlling the air operations can include both an Air Attack Supervisor and a lead plane. The role of the Air Attack Supervisor is to select the target and inform the lead plane. The lead plane identifies the target for the tanker pilots, identifies any hazards in the vicinity, and may provide additional assistance in an effort to ensure effectiveness and safety.

3. On the morning of June 21, 1995, six air tankers, a CDF Air Attack Supervisor, and a USFS lead plane were operating over the Butterfield fire about 28 miles east of Ramona.

4. The Air Attack Supervisor over the Butterfield fire on the day of the accident was CDF employee Brian Logan. His primary responsibility was the implementation of a plan supplied by the Incident Commanders to accomplish a common fire suppression goal. The USFS lead plane took direction from CDF employee Brian Logan over the Butterfield fire. (RT, IV–221:10–21.)

5. Shortly prior to the accident, the six air tankers were in single orbit at approxi-

mately 1,500 feet above ground level, loaded and waiting for instructions. A few minutes before 1100 hours, a USFS lead plane known as Lead 5–5, piloted by Mike Lynn, arrived at the fire. Mr. Lynn arrived to replace Lead 5–6, piloted by USFS employee Mike Smith. After a few minutes of briefing, Lead 5–6 was released to return to Ramona Airport.

6. About three or four minutes after Mike Smith in Lead 5–6 was relieved and presumably was returning to Ramona, Mike Lynn in Lead 5–5 received instructions from CDF Air Attack Supervisor Brian Logan that air tanker operations were to stop and the tankers were to return to base still loaded. Mr. Lynn relayed these instructions to the air tankers. One air tanker was directed to return to Hemet–Ryan Air Attack Base in Hemet, and the other five air tankers, along with Lead 5–5, were directed to return to Ramona.

7. One of the air tankers returning to Ramona was the DC–4 piloted by Gary Cockrell, known as "Tanker 19" or "T–19". His co-pilot was Lisa Netsch. Tanker 19 and lead 5–6, piloted by Mike Smith, collided as both planes neared the airport. Lead plane pilot Mike Smith, air tanker captain Gary Cockrell, and air tanker co-pilot Lisa Netsch were all fatally injured. The U.S. has admitted liability for causing the accident.

8. In returning to base from the Butterfield fire, the air tankers could be called back to the fire, or diverted to a new fire, by the joint Incident Commanders of the Butterfield fire (CDF and USFS). However, there was no control being exercised by the Incident Commanders, and those within the chain-of-command, including the CDF Air Attack Supervisor and USFS lead plane, as to the manner and method employed by the air tanker pilots in returning to base.

9. USFS lead plane pilot Mike Lynn released the air tankers on instructions from CDF Air Attack Supervisor Brian Logan. Mike Lynn had no authority to dictate, and did not attempt to instruct the tanker pilots, as to speed, altitude, direction, landing pattern, etc., for their return to the Ramona airport.

10. The air tanker pilot alone is responsible for returning to base, and the manner and method that the tanker is flown back to base is controlled by the pilot alone.

**B. The Contract for Air Tanker Services Between the United States and Aero Union Corporation.**

11. The air tankers operating over the Butterfield fire on the day of the accident, including Tanker 19, were owned by Aero Union Corporation ("Aero Union"). The Aero Union air tankers were under contract to the USFS for the 1995 fire season.

12. Flying air tanker aircraft is not part of the United States' regular business. Although the USFS in 1995 did operate some of its own waterborne air tankers in 1995, the U.S. has contracted for air tanker services with vendors such as Aero Union for several decades. Richard Denker is the National Contracting Officer for the USFS. Mr. Denker testified that the U.S. has been contracting out for air tanker services for over 30 years.

13. A Contract for Air tanker Services for the 1995 fire season (hereafter "Contract") was awarded to Aero Union on or about November 11, 1994, after an extensive solicitation and bid process. (RT, I–108:2 to 110:13; Ex. X.) Aero Union was one of several vendors selected by the USFS to provide aerial fire suppression services for the 1995 season. The first line of the Contract states that "[i]t is the intent of this contract to provide the Government with Air tanker services as described herein." (Ex. A, p. C–2, § 1.1.1.)

14. The Contract is approximately 150 pages in length and requires Aero Union to provide all of the necessary aircraft, equipment, qualified pilots, mechanics and other support personnel necessary to operate the air tankers on firefighting missions

throughout the United States, including Alaska.

15. There is no language in the Contract concerning an alleged "special employment" relationship between the U.S. and the Aero Union air tanker pilots. To the contrary, the Contract draws a distinction between U.S. employees and the employees of air tanker service providers, such as Aero Union. Section I–35 of the Contract (page I–56), entitled "Property and Personal Damage", contains the following section:

"(b) The Contractor [e.g., Aero Union] shall be responsible for all damage to property and to persons, including third parties, that occur as a result of his or his agent's or employees' fault or negligence. **The term 'third parties' is construed to include employees of the Government.**" (Emphasis added.)

16. The parties to the 1995 Contract did not intend to create a special employment relationship between Aero Union employees and the U.S. Richard Denker, the USFS national Contracting Officer, negotiated and signed the Contract on behalf of the U.S. He testified that it was not his intention when signing the Contract that Aero Union employees would be regarded as U.S. employees. (RT, I–175:22 to 177:2.)

17. Victor Alvistur is currently the president of Aero Union, and served as its general manager in 1995. Mr. Alvistur signed the Contract on behalf of Aero Union. Mr. Alvistur testified that he never intended to make Aero Union tanker pilots, including Decedents Gary Cockrell and Lisa Netsch, the special employees of the USFS when he signed the Contract. He did not intend to make them any other type of government employee. (RT, III–181:15 to 182:1.)

18. There is no provision in the Contract regarding "supervision and control" over tanker pilots by the USFS, either at a designated base or while airborne. The Contract does not address whether the tanker pilot is required to follow the direction of any USFS employee. (RT, II–

95:4–8.) There is no mention that the tanker pilot should heed the instructions of a USFS representative while on the ground, or the direction of a USFS lead plane pilot while over a fire.

19. There is nothing in the Contract regarding a "chain-of-command" while over a fire, either federal or state. There is no mention in the Contract that the tanker pilots must follow the direction of those within the ICS.

20. The Contract clarifies that the pilot-in-command is solely responsible for the safe operation of air tanker aircraft. Section 3.3.1 of the Contract states:

"The Pilot shall be responsible for the safe operation of the aircraft and the safety of its occupants and cargo.... The Pilot shall refuse any flight or landing which the Pilot considers hazardous or unsafe."

21. Under the terms of the Contract, the tanker pilot had the ultimate decision on whether to make a retardant drop and could refuse any instruction to do so if the tanker deemed the deployment unsafe.

22. Although the term of the Contract was for one year, there were mandatory availability periods set forth in the Contract for each "Item", i.e., the particular tankers to be assigned to various bases around the United States. The mandatory availability period for each Item was for all air tanker services, including the aircraft, the crew, and everything else required to meet the Contract requirements. (RT, I–123:17–21; 132:24 to 133:11.)

23. Gary Cockrell and Lisa Netsch were assigned to Item 22 of the Contract. The mandatory availability period for Item 22 was June 15, 1995 to November 17, 1995. The designated base for Item 22 was the Hemet–Ryan Air Attack Base, which is a joint facility operated by both the USFS and CDF. (RT, II–21:12–23.) Aero Union alone made the decision to assign Tanker 19 to this location, and assigned Gary Cockrell and Lisa Netsch as the pilot and co-pilot of Tanker 19. The

Contract granted no authority to the U.S. to make these assignments. (RT, III–128:22 to 132:18.)

24. Gray Cockrell and Lisa Netsch had only been assigned by Aero Union to Hemet–Ryan for six (6) days when the accident occurred.

25. Although the Contract, at Section 1.1.1, gave the Government the 'exclusive use' of the air tankers, the air tankers and pilots were also available for use by state agencies pursuant to interagency agreements, and were used to fight fires on federal, state, and privately-owned lands. (RT, I–138:9–15; Ex. A, p. C–2 § 1.1.4.)

26. There was a "closest resource concept" followed in USFS Region 5 (California and Hawaii), during 1995, pursuant to the interagency agreements between the USFS, CDF, and other state and federal agencies, referenced in the Contract. (RT, I–203:8 to 204:11.) The "closest resource concept" requires the initial dispatch of air tankers and other resources which ·are closest to the fire location, regardless of the particular agency which has contracted for that resource. (RT, II–100:19–25; 108:9 to 110:5; IV–62:3–12.)

27. The phrase "exclusive use" appearing in the Contract meant that the contractor, e.g., Aero Union, was exclusively paid by and under the terms of the Contract, despite the fact that the air tankers were available for the non-exclusive use of several public agencies and private landowners. "Exclusive use" did not mean that .the Aero Union air tankers were exclusively used by the USFS. Whatever power the Contract granted to the USFS to control the operation of a particular air tanker had been shared with several other entities, as reflected by the interagency agreements referenced in the Contract itself. This is confirmed by Mr. Denker's testimony that the USFS always paid Aero Union the availability and flight rates for the aircraft under the terms of the Contract. (RT, II–6:22 to 7:6.) When the tanker was used by an entity such as CDF on a fire, then CDF reimbursed the USFS for the flight time. (RT, II–4:17 to 7:5.)

28. The time during which an Aero Union air tanker and pilot are available and awaiting dispatch is referred to as "stand-by hours." The Contract provided that the stand-by hours were to be established by the Contracting Officer's representative. (Ex. A, p. F–3 § 1.5.2.) These were the hours that the aircraft and tanker pilots, as designated by Aero Union, were required to be available to meet the dispatch requirements. The stand-by hours were not "work hours" in the traditional sense. (RT, III–128:13 to 131:22.) There is nothing in the Contract which required the tanker pilot to remain at a designated tanker base during stand-by hours, as long as the aircraft could be airborne within 15 minutes as required by the Contract. (RT, I–206:7–20.)

29. The U.S. did not set the pilot's day off. The day off for an Item designated by the Contract was set by the National Interagency Fire Center in a coordinated effort to ensure air tanker availability on a national basis. (RT, I–120:20 to 121:8.) Mr. Denker testified that the initial request for proposal sent to Aero Union listed the days off for each Contract Item. (RT, I–183:14–22.) Victor Alvistur testified that Aero Union knew the day off for Item 22 in advance when bidding on the Contract. (RT, III–177:21 to 178:6.)

30. The Contract sets out qualifications for pilots, including a Pilot Qualification card. (Ex. A, pgs. C–26 to C–31 § 3.2.) The card issued to the pilot-in-command of the air tanker by the U.S. was an interagency pilot qualification card. The term "inter-agency" means federal inter-agency, and does not include CDF. (RT, II–31:6 to 32:7.)

31. Although the Contract set out minimum pilot qualifications, the only training of tanker pilots mandated by the Contract was the requirement that tanker pilots must certify that they have viewed an air tanker video supplied by the USFS at least once in their careers. (RT, II–2:22 to 3:11; Ex. A, p. C–26 § 3.2.1.6.)

32. Section 3.3.3 of the Contract (p. C–31), provided that the USFS could request a pilot substitution from Aero Union if it was dissatisfied with the performance the pilot, either effectiveness or safety. However, there was no contractual authority for the USFS to remove a tanker pilot, or to discipline, suspend, reprimand, fire or dock the pay of an Aero Union pilot. (RT, I–186:7–20; 199:14 to 201:12.)

33. All personnel decisions, including hiring, firing, promotions and discipline, were reserved under the Contract to Aero Union. (RT, III–189:6 to 190:2.) There was no Contract requirement of a performance evaluation of Aero Union pilots by the USFS. (RT, V–57:15–22.)

34. There is nothing in the Contract which granted the USFS the authority to contact a tanker pilot directly concerning any problems. (RT, I–189 to 194:25.) The Contract only provided that Aero Union would be notified in writing by the USFS concerning any problems with pilots. (RT, I–199:14 to 200:15.) Sec. 3.3.3 provides in relevant part:

> "... The Contractor will be notified in writing stating the conditions of unsatisfactory performance, and stating a time limit by which a replacement Pilot must be obtained."

35. If the problems were not corrected, the only recourse for the USFS was to withhold payment to Aero Union by declaring the "Contractor", Aero Union, unavailable. Sections 1.6.1 and 1.6.3 (p. F–4), state:

> "1.6.1—The Contractor is unavailable whenever the aircraft or pilot is not in condition to perform or fails to perform within the requirements under Part I, Section F.1.5."

> "1.6.3—Unavailability status will continue until the cause of the failure is corrected...."

36. "Unavailable" included the failure of any pilot to meet the 15–minute dispatch requirement, i.e., to be airborne within 15 minutes of receiving a dispatch, which the USFS regarded as a breach of contract by Aero Union. (RT, I–202:1–9.)

The only recourse of the USFS under the Contract was to withhold payment to Aero Union for that particular aircraft or, if the problems were persistent, to terminate the entire Contract for default. (RT, I–200:19 to 210:12; 202:10–17; Ex. A, p. F–4 § 1.6.2.) The USFS had no authority under the Contract to directly contact and reprimand the tanker pilot, or to instruct him or her to take off more quickly. (RT, I–202:18–21; 206:21 to 207:8.)

37. Aero Union retained the sole authority under the Contract to substitute both aircraft and pilots. (Ex. A, p. C–37 § 4.3.) The Contract provided that the U.S. had the authority to approve crew substitutions (Ex. A, p. C–37 § 4.3.1), however, provided the crew met the Contract requirements, the U.S. could not unreasonably withhold such approval. (RT, 187:5–14.)

38. The Contract provided that the tanker pilots must attend a prework conference (Ex. A, p. C–26 § 3.2.1.7); yet there was nothing in the Contract which dictated what was to be discussed at the conference. The primary purpose of the prework conference was to review the base operating plans and the requirements of the Contract. (RT, I–179:1–10; II–44:8 to 47:12.) The "rules of conduct" and "sexual harassment" topics, discussed at the 1995 prework conference attended by Gary Cockrell and Lisa Netsch at Hemet–Ryan, related to rules of the tanker base, not Contract requirements. (RT, II–46:24 to 50:18.)

## C. The Relationship Between The U.S. And Aero Union Air Tanker Pilots.

39. There is no evidence to suggest that Gary Cockrell or Lisa Netsch were informed of, or consented to, an employment relationship with the U.S. at any time prior to the subject accident. To the contrary, the undisputed testimony was that Decedents never considered themselves to be USFS employees. (RT, III–93:2–8; IV–63:3–10.)

40. During the 1995 prework conference at Hemet–Ryan, Gary Cockrell and Lisa Netsch were **not** instructed to conduct themselves as USFS employees, and were **not** told to abide by USFS regulations regarding conduct. To the contrary, Gary Cockrell and Lisa Netsch were informed during this prework conference that they were not to wear the USFS uniform or insignia, they were not to drive U.S. government vehicles, and they were not to tell the public they were employed by the USFS. (RT, IV–57:3 to 60:7; 191:16 to 192:2.)

41. During 1995 and previous years, USFS employees have been prohibited from receiving gifts over a small dollar amount from Aero Union employees. (RT, III–17:23 to 18:9.) Aero Union pilots have been forbidden by the USFS from buying lunches for USFS employees and, on occasion, from even socializing outside of the tanker base with USFS employees. (RT, III–229:7 to 230:5; IV–57:3 to 60:25.)

42. Aero Union has always hired and trained all of its tanker pilots. Although Aero Union's Contract bid stated that some of Aero Union pilots were seasonal employees, they were not truly seasonal because their Aero Union benefits, including health insurance, continued year round. (RT, III–190:5 to 191:24; 208:11–22.) Mr. Alvistur testified that Aero Union finds it desirable to have a stable work force of pilots.

43. Only Aero Union had the right to fire an Aero Union air tanker pilot; not the U.S. The U.S. could remove the pilot's federal pilot qualification card, by "decarding" the pilot, due to concerns over effectiveness or safety. However, the only result accomplished by the removal of a federal card of a tanker pilot was that he or she would no longer be the pilot-in-command of an air tanker on the federal Contract. (RT, V–17:23 to 20:25.) A decarded pilot could still fly as a co-pilot on the federal Contract, could become carded by CDF and fly a state contract, or Aero Union could have other work for the pilot, such as ferry flights or mechanical work.

(RT, IV–88:6 to 90:6.) Both Gary Cockrell and Lisa Netsch could have done any of this work in the event they lost their federal card. They were both certified Airframe and Powerplant mechanics and could have performed maintenance work for Aero Union. (RT, IV–47:19 to 50:5.)

44. At all times prior to the subject accident, Aero Union made all the assignments and personnel decisions concerning the tanker pilots; not the U.S.

45. Aero Union paid all of the wages and fringe benefits to its pilots, including a bonus at the end of the fire season which included payment for paid holidays. The health insurance and profit-sharing for Aero Union pilots continued year-round. Aero Union paid a fixed overnight allowance to the tanker pilots when away from their assigned base. The amount of the overnight allowance paid to the tanker pilot was set by Aero Union, within its sole discretion, and was not set by the Contract.

46. The U.S. paid Aero Union an availability rate and flight rate for the air tankers. (RT, II–6:22 to 7:6.) It did not pay Aero Union an hourly wage for the air tanker pilots, as would be the case in a "labor brokerage" situation. The U.S. could not dock or withhold an air tanker pilot's salary from Aero Union, even if the pilot failed to meet the 15–minute dispatch requirement. (RT, I–206:21 to 207:8.)

47. The Contract required Aero Union to provide workers' compensation insurance. (RT, I–175:10–21.) Aero Union's insurer, not the U.S., paid all workers compensation death benefits to Plaintiff Peggy Cockrell. The U.S. was never liable for, and never paid, any of the workers compensation benefits received by Peggy Cockrell.

48. Aero Union supplied all of the equipment for use by the crew, including the aircraft, the avionics system, flight suits, emergency supplies, and virtually everything required for the use and operation of the aircraft. A governmental enti-

ty, such as CDF or the USFS, supplied the fire retardant or water that was dropped from the aircraft. Fuel and all other consumables were supplied by Aero Union. (RT, IV–62:13 to 63:2; Ex. A, p. C–3 § 1.3.)

49. During 1995 and previous years, when Aero Union air tankers were assigned to a state-run air attack base, such as a CDF base, the facilities, retardant and water were all provided by the state agency. Even at Gary Cockrell's assigned base, Hemet–Ryan, it was jointly operated by CDF and the USFS. (RT, II–13:6–24.) On a dispatch to CDF fires from Hemet–Ryan, the retardant and water were provided by CDF.

50. The only items that were exclusively supplied by the USFS for use by the air tanker pilots during the 1995 fire season were government forms and a single videotape cassette, which provided some basic aerial firefighting information.

51. Aero Union had always provided all formal pilot training. Aero Union has pilot qualification requirements substantially above the minimums required by the Contract. (RT, III–193:4–10; V–46:3 to 48:2; 54:20 to 55:5.) As of the date of trial, the USFS had never refused an Aero Union pilot because of his or her qualifications. (RT, III–195:8–11.)

52. It takes from between 2 and 9 years to train a tanker pilot to be a pilot-in-command. (RT, III–28:3–15.) Aero Union training was ground school, then systems training and then type training. After an Aero Union co-pilot obtained his or her FAA type rating, the co-pilot could begin to start making drops. After two or three years, then the co-pilot learned to make the drops from the left pilot's seat. (RT, IV–22:12 to 24:8; V–45:17 to 47:20.)

53. There was no mandatory training provided by the USFS to air tanker pilots during the course of Decedents' careers. There were no mandatory classes offered by the USFS. (RT, II–3:5–11.)

54. The USFS Air tanker video did not constitute training, considering all that must be learned to be an air tanker pilot.

The video was useful at one time to learn about the new radio system used by the USFS in the 1980's. However, once the Contract was changed to require Aero Union to provide the radios, the information provided by the Air tanker video became obsolete. The remainder of the Air tanker video is elementary material. (RT, IV–45:1–16.)

55. Aero Union pilot training was ongoing. Every year the pilots met at the Aero Union facilities in Chico for pre-season training. The training included a ground school refresher on systems, instrument simulator time, flying time and emergency procedures. The pilots dropped water on the local hillsides to practice. They then took an FAA heavy aircraft pilot-in-command check ride. After that, they went through the carding procedure and obtained the USFS qualification card. (RT, IV–46:19 to 47:18.)

56. The USFS carding process for air tanker pilots was an evaluation of the pilot's skills. If a deficiency was observed during the carding process, the USFS would speak with Aero Union's Chief Pilot and not the pilot directly. Aero Union was solely responsible for the training necessary for a pilot to receive his or her card. (RT, III–91:14 to 92:25.)

57. The U.S. does not dispute the fact that Gary Cockrell and Lisa Netsch were highly skilled professionals.

58. Regardless of whether the base was CDF or USFS, no base manager told an Aero Union tanker pilot what to do while awaiting a dispatch. The base manager only set the stand-by hours and handled the dispatches. There were no work assignments given, as there was no contractual authority to do so. The tanker pilots were free to move around as they pleased, (except for areas of the base restricted to government employees). (RT, IV–3:19 to 5:11.)

59. At the Hemet–Ryan Air Attack Base in 1995, the Aero Union air tanker pilots could leave the base during stand-by

hours. It was the tanker pilot's discretion as to whether or not he or she could meet the 15–minute dispatch requirement. If the pilots left the base, they had a two-way radio in case the base received a dispatch. (RT, II–41:15 to 43:12.)

60. Gary Cockrell and Lisa Netsch were certified Airframe and Powerplant mechanics and could perform maintenance work on Tanker 19 at the Hemet–Ryan base during the 1995 fire season. No Forest Service permission was needed to tinker with the aircraft, and the pilots usually made frequent adjustments to the aircraft.

61. The USFS did not tell the air tanker pilots what to do with the planes mechanically, and they had no knowledge of what maintenance took place. The USFS was only notified if the plane broke down. All details of maintaining the aircraft were performed by the pilots and/or Aero Union mechanics. Aero Union usually had their own mechanics at multi-plane tanker bases. There were no USFS mechanics. When there was a large fire involving multiple air tankers, Aero Union mechanics would fly to the base where tanker operations were being conducted. (RT, IV–47:22 to 50:5.)

62. The USFS could not order an Aero Union pilot to take a USFS employee on board an air tanker; permission from Aero Union was required. (RT, IV–55:25 to 56:21.)

63. The Chief Pilot of Aero Union would periodically fly with the tanker pilots during each fire season. He made sure the aircraft was being flown properly and correctly. The USFS did not check Aero Union pilots during the fire season. (RT, IV–69:3–20.)

64. In California during 1995, each base had a designated initial-attack area. Any calls coming from that area would result in the automatic dispatch of the closest resources, whether CDF or USFS. (RT, IV–62:3–12.) Dispatches came into Hemet–Ryan during the 1995 fire season and federally-contracted air tankers were dispatched. (RT, II–84:9–19; 101:7–12.) If the CDF dispatch was initial attack,

then the USFS was contractually bound to send a federally-contracted air tanker, as per the cooperation agreements between the USFS and CDF. (RT, II–100–8 to 101:12; 108:2 to 110:5; Ex. J.)

65. During the 1995 fire season, federally-contracted air tankers were often dispatched to CDF fires in Southern California by CDF dispatchers. (RT, IV–151:8–11.) It was frequently unknown at the time of the dispatch whether the fire was state or federal. The initial dispatch of resources was controlled by a centralized computer system which kept track of the various resources, both CDF and USFS, assigned to an initial attack response. (RT, IV–179:10 to 182:5.)

66. Under USFS dispatch procedures utilized in 1995 and previous years, the dispatcher would generally provide bearing, distance, and the coordinates to the Aero Union air tanker pilot. The dispatcher did not tell the Aero Union tanker pilot how to start the airplane, taxi and take off. Most tanker bases were at non-tower airports. How the pilots got to the fire destination, including direction, altitude and speed, was determined by the tanker pilot alone and depended on the performance characteristics of the particular aircraft. (RT, IV–24:18 to 26:23.) One example provided by the testimony of Bill Waldman, an experienced Aero Union air tanker pilot and former Chief Pilot of Aero Union, was the difference between a P–3 and DC–4 in their ability to take a direct path over a mountain range. The DC–4 may have to use an "S" pattern to gain sufficient altitude, while the P–3 will use a more direct route. (RT, IV–26:3–15.)

67. All Aero Union pilots-in-command during 1995 were required to obtain an "initial-attack rating". (RT, IV–22:12 to 23:8; 55:2–6.) If an initial-attack-rated pilot was the first one to arrive on the fire scene, that pilot, in effect, became the Incident Commander. (RT, III–27:12 to 28:12.) The initial-attack pilot determined the most effective way to use the load of retardant and made all decisions concern-

ing the run and drop. (RT, IV–7:5–11.) These tanker pilots had to learn fire behavior and "fire signs", which required knowledge of the best method to suppress the fire with retardant. (RT, IV–22:12 to 23:8.) Gary Cockrell was a qualified initial-attack-rated pilot. (RT, II–147:17 to 148:1.)

68. During 1995, Gary Cockrell, as an initial-attack pilot, could have been dispatched from Hemet–Ryan by CDF, to a CDF fire, and made the initial attack himself. Gary Cockrell could also have made an initial attack on a federal fire in 1995, before a lead plane arrived. (RT, II–15:9–16; 16:3–9.)

69. There were several initial attacks by federally-contracted tanker pilots during 1995 in Region 5. CDF Air Attack Supervisor, Brian Logan, testified that these occurred on days when there were multiple fire starts and not enough Air Attacks and lead planes to go around. If no one was on the ground, the initial-attack pilots would take the initiative, do what they had been trained to do and suppress the fire. If there were firefighters on the ground, the initial-attack pilot would first determine the plan of attack before making any drops. (RT, IV–218:13 to 219: 10.)

70. There was an 8–door retardant system on the air tankers during 1995. The tanker pilot could select 8, 4, 2 or 1 doors. The pilot could also change the delay sequence for the timing of the retardant door openings. Making these adjustments controlled the amount of retardant reaching the ground and changed the "footprint" of the retardant. This also allowed the pilot to change the volume of retardant, gallons per 100 sq. ft., which is the coverage level. (RT, IV–36:7 to 37:4.)

71. On those fires where a USFS lead plane was present, both during the 1995 fire season and previous years, the USFS lead plane would assist the air tanker pilot with effectiveness and safety of the retardant drops.

72. If the lead plane's suggestions were disregarded by the tanker pilot, then the lead plane pilot might complain to his or her USFS superiors. After a negotiation process, the tanker pilot could be fully vindicated or, in the worst-case scenario, the USFS could eventually de-card the tanker pilot. However, de-carding only meant that the tanker pilot could no longer be a pilot-in-command on the federal Contract, not that the pilot would be terminated from his or her employment with Aero Union. (RT, IV–104:10 to 107:4; 167:7–20; V–26:18 to 28:5.)

73. At all times prior to the subject accident, the lead plane's primary function was target and hazard identification. (RT, IV–30:16–24.) The lead plane pilot would direct altitude, direction, when to break off, and when to drop to the tanker pilot. While a lead plane could make such directions, the pilot-in-command had the final say and could refuse deployment instructions from the Government fire controller if the pilot deemed the deployment unsafe. (RT, IV–32:2–9.) All decisions on how to actually make the drop were made by the tanker pilot. Actual physical operation of the controls of the aircraft, e.g., speed, flaps, etc., were part of making a safe and effective drop. (RT, IV–44:2–20.) It is all done by feel; there are no electronics. The tanker pilot is able to release 27,000 pounds of retardant in 3 seconds, about 25% of the aircraft weight. A comfortable way to make the drop for the tanker pilot is to figure a way out of the situation if the drop has to be aborted. These decisions are by the tanker pilot; not the lead plane. (RT, IV–37:5 to 40:15.)

74. During the 1995 fire season, as well as during previous years, tanker pilots would often tell the lead plane what kind of run should be made, e.g., whether they want a flat run or a high turning approach. It was the judgment of the tanker pilot alone as to whether the drop and run were safe. The tanker pilot decided how to get down the side of a mountain, and when to push the button to make the retardant hit the target. Dropping retardant is all done by the tanker pilot's experience and judg-

ment—the lead plane takes no part in these decisions. (RT, III–223:8 to 224:4.)

75. At all times prior to the subject accident, the air tanker pilot-in-command had the final say on whether to drop, regardless of whether the deployment instruction was given by the Air Attack or the lead plane. The tanker pilot made it known if he or she did not like the planned drop. (RT, IV–223:1–8.)

76. The alleged direction and control over tanker pilots by lead plane pilots, even if, as the defense contends, it existed, was only a small percentage of the total time spent by the Aero Union air tanker pilots in the performance of their job duties during 1995. (RT, III–224:6 to 225:18.)

77. Lead planes were not present on most fires in California during 1995. (RT, IV–7:12 to 8:4.; V–83:7–14.) There were only six lead planes in California during 1995, and these were based in Redding and Ontario. In comparison, there were a total of about 30 air tankers based throughout California, of which 18 or 19 were contracted to the federal government. Because of the shortage and location of the lead planes, there were several fires where no lead plane was available. (RT, IV–9:2 to 10:14; 13:4 to 16:12; 19:20 to 21:20.) Lead planes were also not present because most of the fires in California during 1995 were not large forest fires. They were small brush or grass fires. These fires normally required only one tanker to deliver a few loads of retardant, and were usually extinguished before the lead plane arrived. (RT, IV–5:12 to 6:22.)

### III. CONCLUSIONS OF LAW

1. These lawsuits are brought pursuant to the Federal Tort Claims Act ("FTCA") which acts as a limited waiver of the government's sovereign immunity for liability in tort. 28 U.S.C. §§ 1346(b); 2671, *et seq.* The FTCA provides that District Courts shall have exclusive jurisdiction of civil actions against the United States for, *inter alia*, personal injury or death caused by

the negligent acts of its employees acting within the scope of employment.

2. California law relating to "special employment" applies. Congress, in enacting the FTCA, intended that "[b]oth the precipitating tort and the scope of the government's vicarious liability were to be governed by 'the law of the state where the act or omission occurred.' (Citations.)" *Pinckney v. United States,* 671 F.Supp. 405, 407–408 (E.D.N.C.1987).

3. Liability of the U.S. under the FTCA extends to circumstances where the government, if a private person, would be liable according to the law of the place where the act or omission occurred. 28 U.S.C. §§ 1346(b), 2674. Both of these provisions require the court to analogize the U.S. to a private actor in a similar situation and apply state law to determine amenability to suit and substantive liability. *LaBarge v. County of Mariposa,* 798 F.2d 364, 366 (9th Cir.1986).

4. The burden, a preponderance of evidence, is on the U.S. to establish its affirmative defense of special employment. In order to meet this burden, the U.S. must affirmatively establish an employment relationship with decedents Gary Cockrell and Lisa Netsch. California law clearly provides that **only an employer** who has entered into an employment relationship with its employee is entitled to the workers' compensation exclusivity rule. *McLandrich v. Southern California Edison Co.,* 917 F.Supp. 723, 727, (S.D.Cal. 1996), *on recon. aff'd,* 942 F.Supp. 457 (S.D.Cal.1996), citing *inter alia, Gigax v. Ralston Purina Co.,* 136 Cal.App.3d 591, 598, 186 Cal.Rptr. 395 (1982), ("The workers' compensation laws were not designed to relieve one other than the employer from any liability imposed by statute or common law.").

5. There are different standards applied under California law for determining when an injured individual is entitled to workers' compensation benefits, as opposed to the determination of when such

**1006**

individual is barred from maintaining a civil action against a third party under the workers' compensation exclusivity rules. A presumption of employment and agency principles apply when a party is attempting to obtain workers' compensation. In contrast, California does not apply agency principles when the party seeking to establish an employee relationship is a defendant in a common law suit. Where the exclusivity defense is raised in a common law suit, California courts "are more exacting in requiring proof of an employment relationship." *Spradlin v. Cox*, 201 Cal. App.3d 799, 807–08, 247 Cal.Rptr. 347 (1988); see also, *Laeng v. Workmen's Comp. Appeals Bd.*, 6 Cal.3d 771, 779 n. 8, 100 Cal.Rptr. 377, 494 P.2d 1 (1972).

■ 6. Nowhere in the California Constitution is the concept of 'special employment' mentioned; it is a creature of the courts of California, and only later incorporated by the legislature into a section of the California Insurance Code addressing workers' compensation. The factors listed in *Kowalski v. Shell Oil Co.*, 23 Cal.3d 168, 151 Cal.Rptr. 671, 588 P.2d 811 (1979), *Marsh v. Tilley Steel Co.*, 26 Cal.3d 486, 162 Cal.Rptr. 320, 606 P.2d 355 (1980) and *Brassinga v. City of Mountain View*, 66 Cal.App.4th 195, 77 Cal.Rptr.2d 660 (1998), provide the relevant standards for determining whether there was a "special employment" relationship between the U.S. and Decedents in these consolidated cases. If established, the following factors indicate the existence of a special employment relationship: a) control by the alleged special employer over the details of the employee's work; b) the alleged special employer paid wages to the employee; c) the alleged special employer had the power to discharge the employee; d) the work performed by the employee was unskilled; e) the work tools were provided by the alleged special employer; f) the work was part of the alleged special employer's regular business; g) the employee expressly or impliedly consented to the special employment relationship; h) the parties be-

lieved they were creating a special employment relationship; and i) the alleged special employment period was lengthy. *Brassinga*, 66 Cal.App.4th at 195, 77 Cal. Rptr.2d 660 (citing *Marsh*, 26 Cal.3d at 492–493, 162 Cal.Rptr. 320, 606 P.2d 355; *Kowalski*, 23 Cal.3d at 176–178, 151 Cal. Rptr. 671, 588 P.2d 811).

■ 7. California law also provides that the following circumstances tend to negate the existence of special employment: The worker is: a) not paid by and cannot be discharged by the borrower; b) a skilled worker with substantial control over operational details, c) not engaged in the borrower's usual business, d) employed for only a brief period of time, and e) uses tools and equipment furnished by the lending employer. *Marsh*, 26 Cal.3d at 492, 162 Cal.Rptr. 320, 606 P.2d 355 (citing *Kowalski*, 23 Cal.3d at 176–177, 151 Cal. Rptr. 671, 588 P.2d 811).

■ 8. Given the detailed Contract governing the relationship between Aero Union and the U.S., the Court finds that a key factor for consideration in this instance is whether the parties intended to create a special employment relationship. The determination is made by reference to the terms of the Contract, as well as the statements and conduct of the contracting parties. One of the primary guides to judicial construction of contracts between party-litigants is to support, if possible, what appears objectively to have been the intentions of the parties when they entered into the contract relationship. *See* Cal. Civ.Code § 1636; *see, e.g., Hernandez v. Badger Contr. Equip. Co.*, 28 Cal.App.4th 1791, 34 Cal.Rptr.2d 732 (1994); *Pacific Portland Cement Co. v. Food Mach. & Chem. Corp.*, 178 F.2d 541 (9th Cir.1949).

9. The evidence, without contradiction, supports the conclusion that neither Aero Union nor the U.S. intended to create an employment relationship between Aero Union employees and the U.S. The Contract itself does not contain any language that could be construed as creating a dual,

temporary, or special employment relationship. The signatories to the Contract, Richard Denker, the USFS Contracting Officer, and Victor Alvistur, current president and former general manager of Aero Union, testified that they did not intend to create any type of employment relationship between Aero Union employees and the U.S. The testimony confirms the intent apparent from the language of the Contract, that creating an employment relationship between Aero Union employees and the U.S. was simply not contemplated or intended. The first line of the Contract states that "[i]t is the intent of this contract to provide the Government with Airtanker services as described herein." (Ex. A, p. C–2 § 1.1.1.) The intent to create a service contract, and not an employment contract, is therefore evident from the Contract itself, as well as the testimony of the parties' contracting representatives.

10. It is also not insignificant that USFS briefing representatives repeatedly lectured the Aero Union employees that they were not Government employees. The Government has always advised Aero Union personnel that they were not employees of the Government, were not permitted to wear Government uniforms, operate Government vehicles, or in any way to hold themselves out as employees of the Government. The Court concludes from the undisputed evidence received in this trial that the Government intended to create an independent contractor relationship with Aero Union, and at all times up to the time of the accident did not intend or claim that it was a "special employee" of Aero Union employees.

11. One of the principal factors in determining special employment is whether the alleged special employer controlled or had the right to control the details of the work of the alleged special employee. *McLandrich,* 917 F.Supp. at 730–731; *Kowalski,* 23 Cal.3d at 175, 151 Cal.Rptr. 671, 588 P.2d 811; *see also Wedeck v. Unocal Corp.,* 59 Cal.App.4th 848, 857, 69 Cal.Rptr.2d 501 (1997). As stated in *Brassinga,* 66 Cal.App.4th at 215, 77 Cal. Rptr.2d 660: "The key to the existence of a special employment relationship is control. 'Where the servants of two employers are jointly engaged in a project of mutual interest, each employee ordinarily remains the servant of his own master and does not thereby become the special employee of the other.' (Citation.)" The above is in accord with the general rule in California that where both equipment and skilled operators are leased by one company to another, the operators remain the employees of the lessor and do **not** become the special employees of the lessee. *McFarland v. Voorheis–Trindle Co.,* 52 Cal.2d 698, 704, 343 P.2d 923 (1959).

12. In determining whether control was being exercised by the alleged special employer, California courts have analyzed the direction and control being exercised **at the time of the subject accident.** This principle is stated in *Thomas v. Edgington Oil Co.,* 73 Cal.App.3d 61, 64, 140 Cal.Rptr. 635 (1977):

> "... [W]here the alleged special employer is not, at the time of the jury or in connection with the specific task to be performed, exercising control over the details of the work, no special employment exists even though, at some other time and in connection with some other task, such detailed control may have been exercised...."

13. At the time of this accident, without any dispute in the evidence, Decedents were not being controlled by the U.S. as to the details of their work. They had previously been released from a firefighting mission and were on final approach to landing at their base, Ramona Airport, when a USFS plane collided with them, causing both aircraft to crash. One of the stated principal considerations, the element of control over the details of the work, was clearly not present at the moment of the crash in the instant case. Tanker 19 crashed many miles away from the fire scene on its final landing at its base of operations.

14. Furthermore, Aero Union is an independent contractor for the U.S. provid-

ing air tanker services. In fighting fires on public lands, the USFS, CDF, or other state or federal agency, dispatches Aero Union air tankers and provides general direction as to required water or retardant drops. (Unless the air tankers are the first to arrive and conduct an initial-attack themselves.) While governmental entities provide general direction as to the result to be achieved, the details of that work are left to the judgment of the individual pilots themselves.

15. While the Contract contains elaborate detail as to the maintenance crews, air crews, and equipment that Aero Union would supply to the Government, as well as describing the operational missions during which time the Government would deploy and control the use of the crews and equipment, (Ex. A, Part 1.C), the Government did not purport to control the details of how the air tankers were flown, **even on a fire,** let alone once it was released from the operational deployment by the Government over the fire being suppressed. Contrary to the Government's assertions, the fact that the Contract, at Section 1.1.1, gave the "exclusive" right to control the activities of Decedents once dispatched on firefighting missions does not legally transform them into employees of the Government. Rather, the Contract simply gave the Government the ability to control the operational deployment of Aero Union pilots and aircraft. The Aero Union pilots still retained all detailed control over the aircraft, and could refuse instructions from the Government if they deemed the deployment unsafe. (Ex. A § 3.3.1.)

16. The pilot-in-command is solely responsible for, and is the final authority as to, the safe operation of that aircraft under 14 C.F.R. § 91.3(a). *Mattschei v. United States,* 600 F.2d 205, 208 (9th Cir.1979). In-flight decisions that are based on conditions known only to the pilot must be made by the pilot alone. *Spaulding v. United States,* 455 F.2d 222, 226 (9th Cir. 1972). When flying the air tanker, the Decedents alone controlled the innumerable skills and details of maneuvering the tanker. At all times, the Decedents con-

trolled their speed, altitude, attitude, rate of climb or descent, fuel mixtures, flap settings, power settings, prop settings and synchronization, navigation, radio procedures, compliance with all applicable Federal Air Regulations, emergency procedures, fuel management, wing loading, forces of gravity, weight and balance, and every one of the myriad of complicated maneuvers and details required to keep such an aircraft safely airborne—skills which require thousands of hours of training and experience.

17. When Decedents were not on stand-by or deployed on firefighting missions, the Government exercised absolutely no control over them. It was the responsibility of Aero Union pilots and maintenance crews to keep the aircraft and crews ready for deployment. It was solely within the Aero Union employees' control to manage how such maintenance and training would be accomplished.

18. The remaining factors for determining special employment are decided in Decedents' favor. On balance, the Government performed only a fraction of the overall activities; whereas Aero Union performed virtually all of the activities necessary to recruit, train, and manage the workforce. The fraction of activity performed by the Government—the operational direction and deployment of the air tankers—does not rise to the level of the right to control the details of the work to warrant a finding of special employment.

19. While the Government bargained for operational deployment of the tankers under the Contract, it was also simultaneously agreed to by the parties that Aero Union would have exclusive control over the hiring, training, promoting, disciplining, firing, compensating (including required deductions for taxes and other assessments, and provision of all fringe benefits, e.g., health insurance), insuring for liability and workers' compensation, accounting for each employee (e.g., assigning to a certain base and keeping track of hours), outfitting, and supplying equipment for all persons utilized for

maintenance and flights of the tankers described in the Contract.

20. Accordingly, this Court concludes that only Aero Union paid all wages and fringe benefits to Decedents, and only Aero Union paid the workers' compensation premiums and subsequent death benefit claims. Only Aero Union hired the licensed pilots and trained them specifically in the detailed skills needed to perform the required tasks. Aero Union brought each pilot through all the training necessary to qualify them for the aerial firefighting services that Aero Union agreed to perform under the Contract.

21. Aero Union had the exclusive power to discipline and/or fire the Decedents, and controlled their wages according to their performance.

22. Aero Union provided the aircraft and equipment needed by Decedents to operate the aircraft on firefighting missions.

23. Decedents were highly skilled professionals with substantial control over operational details.

24. The Government did not fly air tankers as part of its regular business. Instead, it chose, as a matter of course, to enter into independent contracts with companies such as Aero Union to fulfill most of its aerial firefighting needs.

25. The alleged employment period was brief. Decedents were only required to be available for the five-month mandatory availability period of the one-year Contract, and Decedents were killed only six (6) days into the start of the 1995 fire season.

26. The evidence is undisputed that Decedents did not consent to an employment relationship with the Government.

27. The Court finds that the contractual relationship between Aero Union and the Government was nothing more than a typical independent contractor relationship. The parties did not intend to create and, in fact, did not create, an employment relationship between the Government and the air and maintenance crews employed by Aero Union to fulfill the terms of its service contract with the U.S. The many agreed-to stipulations of the service contract do not serve to convert Aero Union employees into "special employees" of the U.S. At most, the alleged control exercised by the Government was to dispatch the Decedents to particular fires when needed and tell them where to drop the retardant. Other details that are alleged as relevant by the Government, such as the prework conference, setting a minimum wage, and having the ability to remove an Aero Union pilot from the contracted work, are all reasonable requirements of an independent contractor relationship. This fraction of control retained by the Government, and its contracted-for service requirements, do not transform the Government into the special employer of Decedents.

28. The Court holds that the Government, at all material times, was not the "special employer" of the Decedents, whose survivors are therefore entitled to sue the Government under the FTCA for damages. Workers' compensation laws do not bar this action.

29. Judgment and a resolution of costs will abide the determination of damages during the second phase, i.e., the damages phase, of this bifurcated trial.

IT IS SO ORDERED.