**Peggy COCKRELL and the Estate of Gary Cockrell, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Newell Netsch, Elizabeth Netsch, and the Estate of Lisa Netsch, Plaintiffs,**

v.

**United States of America, Defendant.**

**Nos. 97 CV 0281–B AJB, 97 CV 0350–B AJB.**

United States District Court, S.D. California.

April 19, 1999.

Don Alan Ernst (Cockrells), San Luis Obispo, CA, Edward E. Hawkins, San Luis Obispo, CA, James P. Tessier (Netsche), Menlo Park, CA, Michael S. Danko, Menlo Park, CA, for plaintiff.

Fernando Campoamor, Washington DC, for defendant.

## MEMORANDUM AND DECISION

BREWSTER, Senior District Judge.

### I. INTRODUCTION

The separate affirmative defense of special employer immunity of the United States Government ("Government") was bifurcated for separate trial. After a bench trial, and upon review of the trial testimony and exhibits, and of both Plaintiffs' and Defendant's post-trial briefs, the Court decides that the Government was not, at all times material, the special employer of Plaintiffs' Decedents, Gary Cockrell and Lisa Netsch.

## II. STATEMENT OF THE CASE

This wrongful death action was brought by Plaintiffs Peggy Cockrell, the Estate of Gary Cockrell, Newell Netsch, Elizabeth Netsch, and the Estate of Lisa Netsch, against the Government under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). The case arises from the June 21, 1995 mid-air collision between a DC–4 aircraft ("Tanker 19") and a Government Forest Service ("USFS") Beech 58P aircraft ("Lead 26") on approach to the Ramona, California airport. Both planes were returning from aerial fire suppression activities in connection with a local fire on federal land referred to as the Butterfield fire. Gary Cockrell and Lisa Netsch ("Decedents"), the pilot and co-pilot, respectively, of Tanker 19, died as a result of the accident, as did Michael Smith, the pilot of Lead 56 and a USFS employee. Cockrell and Netsch were general employees of Aero Union Corporation ("Aero Union") working under a contract between Aero Union and the Government.

Two separate lawsuits arising out of the same aircraft collision were first filed against the Government in the District Court for the Central District of California. The lawsuits were subsequently consolidated and transferred to this Court by stipulation. The Government concedes liability for the accident, but it has alleged by separate affirmative defense that the Government was the "special employer" of the Decedents, and as such are immune from third party respondeat superior liability under California workers' compensation law at the time of the accident. *See generally, Kowalski v. Shell Oil Co.,* 23 Cal.3d 168, 174–75, 151 Cal.Rptr. 671, 588 P.2d 811 (1979); *Industrial Indem. Exch. v. Industrial Accident Comm'n,* 26 Cal.2d 130, 134–35, 156 P.2d 926 (1945). Workers in California may not recover against their employers in tort for work-related injuries, but are limited to workers' compensation benefits. *See* Cal.Lab.Code § 3602(a). Upon request of the Government and by order of this Court, the trial was bifurcated in order to litigate first the Government's separate affirmative defense

of special employment. Thus, the issue of damages now remains to be tried.

## III. DISCUSSION

On or about November 11, 1994, Aero Union and the Government entered into an approximately 150 page "Forest Service Contract" ("Contract") by the terms of which Aero Union agreed to furnish numerous tanker aircraft, all required qualified maintenance personnel, and qualified air crews to maintain and fly these aircraft on firefighting missions throughout the country, including Alaska, for the Government. The term of the Contract was for one year, with a mandatory service availability period from June 15, 1995 through November 17, 1995. The accident occurred on June 21, 1995.

One of the primary guides to judicial construction of contracts between party-litigants is to support if possible what appears objectively to have been the intentions of the parties when they entered into the contract relationship. *See* Cal.Civ. Code § 1636; *see, e.g. Hernandez v. Badger Constr. Equip. Co.,* 28 Cal.App.4th 1791, 34 Cal.Rptr.2d 732 (1994); *Pacific Portland Cement Co. v. Food Mach. & Chem. Corp.,* 178 F.2d 541 (9th Cir.1949).

The evidence without contradiction supports the finding of fact that neither Aero Union nor the Government intended to create an employment relationship between Aero Union employees and the Government. The Contract itself does not contain any language that could be construed as creating a dual, temporary, or special employment relationship. Richard Denker, the USFS contracting officer who signed the Contract on behalf of the Government, testified that it was not his intention when signing the Contract that Aero Union employees would be Government employees. (Reporter's Transcript ("RT"), I–175:22 to 177:2.) Victor Alvistur, current president and former general manager of Aero Union who signed the Contract on its behalf, testified that neither was it his intention to create a special

employment relationship nor any other type of employment relationship between the Aero Union employees and the Government. (RT, III–181:15 to 182:1.) This testimony confirms the intent apparent from the language of the Contract, that creating an employment relationship between Aero Union employees and the Government was simply not contemplated or intended. The first line of the Contract states that "[i]t is the intent of this contract to provide the Government with Air-tanker services as described herein." (Ex. A, p. C–2 § 1.1.1.) The intent to create a service contract, and not an employment contract, is therefore evident from both the Contract itself, as well as the testimony of the Parties' contracting representatives.

It is also not insignificant that Government briefing representatives repeatedly lectured the Aero Union employees on the fact that they were not Government employees. (R.T., IV–191:16 to 192:3.) The Government has always advised Aero Union personnel that they were not employees of the Government, were not permitted to wear Government uniforms, operate Government vehicles, or in any way to hold themselves out as employees of the Government. (R.T., III–84:19 to 85:24). The Court concludes from the undisputed evidence received in this trial that the Government intended to create an independent contract relationship with Aero Union, and at all times up to the time of the accident did not intend or claim that it was a "special employer" of employees of the contractor, Aero Union.

In addition to finding no contractual evidence under California principles of contract law to support a finding of the intention to create any special employment, an examination of the specific factors set forth by California courts to determine whether a special employment relationship nevertheless exists also leads this Court to its conclusion that the Government was not the special employer of the Decedents.[1]

The existence or nonexistence of the special employment relationship in any given case has been held to be a question of fact. *See Kowalski,* 23 Cal.3d at 175, 151 Cal. Rptr. 671, 588 P.2d 811.

One of the principal factors frequently pointed out in California cases considering the judicially created status of "special employer" is whether at all material times the alleged "special employer" controlled or had the right to control the details of the work of the alleged special employee. *See Kowalski,* 23 Cal.3d at 175, 151 Cal.Rptr. 671, 588 P.2d 811; *see also Wedeck v. Unocal Corp.,* 59 Cal.App.4th 848, 857, 69 Cal.Rptr.2d 501 (Cal.Ct.App.1997); *McLandrich v. Southern California Edison Co.,* 917 F.Supp. 723, 730–31 (S.D.Cal. 1996). The instant contract elaborates upon and identifies specifically what maintenance crews, air crews, and equipment Aero Union would supply to the Government, as well as describes the operational missions during which the Government would deploy and control the use of the crews and equipment. *See* Contract Part I.C.

At the time of this accident, without any dispute in the evidence, Decedents were not being controlled by the Government as to the details of their work. They had previously been released from a firefighting mission and were on final approach to a landing at their base, Ramona Airport, when they were "rear-ended" by a USFS lead plane, causing both aircraft to crash. One of the stated principal considerations clearly was not present at the moment of the crash in the instant case. The tanker crashed many miles away from the fire scene on its final landing at its base of operations.

Furthermore, the Government did not purport to control the details of how the aircraft was flown, *even on a fire,* let alone once it was released from the operational deployment by the Government over the fire being suppressed. Contrary to the

---

**1.** Nowhere in the California Constitution nor any statute of California is the concept of a "special employer" mentioned. It is a creature of the courts of California.

Government's assertions, the fact that the Contract, at section 1.1.1, gave the "exclusive" right to control the activities of Decedents employed by Aero Union while they are dispatched on firefighting missions does not legally transform them into employees of the Government. So to hold would do violence to the previously analyzed factor considered relevant to the special employment analysis—the clear intent of the parties, which in this case was to create a vehicle for the Government to achieve its·firefighting ends without the onus on the Government of employing a multitude of additional specially trained persons and of owning many additional aircraft. *See, e.g., Brassinga v. City of Mountain View,* 66 Cal.App.4th 195, 217, 77 Cal.Rptr.2d 660 (1998); *Kowalski,* 23 Cal.3d at 178, 151 Cal.Rptr. 671, 588 P.2d 811.

Rather, the Contract simply gave the Government the ability to control the operational deployment of Aero Union pilots. Thus, the Government had the contractual right to dispatch the Aero Union pilots to particular fires, instructed them as to where to drop fire retardant, and released them from a particular firefighting mission when they were no longer needed. The Aero Union pilots still retained all detailed control over the aircraft, and could refuse deployment instructions from the Government fire controller if they deemed the deployment unsafe.[2]

When flying the air tanker, the Decedents alone controlled the innumerable skills and details of maneuvering the tanker. At all times, the Decedents controlled their speed, altitude, attitude, fuel mixtures, flap settings, power settings, prop settings and synchronization, navigation, radio procedures, compliance with all applicable Federal Air Regulations, emergency procedures, fuel management, and every one of the myriad of complicated maneuvers and details required to keep such an aircraft safely airborne—skills which require thousands of hours of training and experience. When Decedents were not on stand-by or deployed on a firefighting mission, the Government exercised absolutely no control over them. It was the responsibility of Aero Union pilots and maintenance crews to keep the aircraft and crews ready for deployment and it was within their control to manage how such maintenance and training would be accomplished.

Overall, the Government only performed a fraction of the overall activities; whereas Aero Union performed virtually all of the activities necessary to recruit, train, and manage the workforce. The fraction of activity performed by the Government— the operational direction and deployment exercised by the Government—does not rise to the level of the right to control the details of the required work to warrant a finding of special employment. While the Government bargained for the operational deployment of the tankers under the Contract, it was also simultaneously agreed to by the Parties that Aero Union would have exclusive control over the hiring, training, promoting, disciplining, firing,[3] compensating (including required deductions for all taxes and other assessments,

2. The Contract provides that the pilots maintained responsibility for the aircraft and could refuse to perform unsafe flights. Section 3.3.1 of the Contract states: "The Pilot shall be responsible for the safe operation of the aircraft and the safety of its occupants and cargo.... The Pilot shall refuse any flight or landing which the pilot considers hazardous or unsafe."

3. Although the Government had the contractual right to exclude participation by any employee of Aero Union in the contracted activity because of perceived unsatisfactory performance, the Government had no power to fire any Aero Union employee furnished under the Contract. Section 3.3.3 of the Contract governed this right: "Pilots who fly recklessly, do *ineffective* work, are unable to adapt to field living conditions, or whose general performance is unsatisfactory in the opinion of the Contracting Officer, shall be replaced by the Contractor [Aero Union]. The Contractor will be notified in writing stating the conditions of the unsatisfactory performance, and stating a time limit by which a replacement Pilot must be obtained."

and accounting for all benefits provided, e.g., health insurance), insuring for liability and workers' compensation, accounting for each employee (e.g., assigning to a certain base and keeping track of hours), outfitting, and supplying equipment for all persons acquired for the maintenance and flights of the tankers described in the Contract. Accordingly, Aero Union paid all wages and benefits to the Decedents. Only Aero Union paid all workers' compensation premiums on Decedents and only Aero Union paid workers' compensation death benefit claims upon their death. Only Aero Union hired licensed pilots, then trained them specifically in the detailed skills they would need to perform the required tasks under the Contract. Aero Union brought each one through all the training necessary to qualify them for the firefighting services Aero Union agreed to perform under the Contract. Aero Union had the exclusive power to discipline and/or fire the Decedents and controlled their income by promoting and adjusting wages according to their performance. Aero Union outfitted the Decedents and provided the aircraft which they flew. All of these employment activities which were the contracted-for responsibility of Aero Union, particularly compensating, hiring, firing, training, qualifying, outfitting, and equipping, are identified as principal factors to evaluate in resolving this issue. These factors negate the existence of a special employment relationship in this case. *See generally, Kowalski*, 23 Cal.3d at 177–78, 151 Cal.Rptr. 671, 588 P.2d 811; *Brassinga*, 66 Cal.App.4th at 217, 77 Cal.Rptr.2d 660; *Wedeck*, 59 Cal. App.4th at 857, 69 Cal.Rptr.2d 501.

Other factors also support this Court's finding that the Government was not the special employer of the Decedents. As mentioned above, the Decedents were highly skilled, a factor which further demonstrates the level of control that they retained over the details of their work. *See Marsh v. Tilley Steel Co.*, 26 Cal.3d 486, 492, 162 Cal.Rptr. 320, 606 P.2d 355 (1980); *Kowalski*, 23 Cal.3d at 177, 151 Cal.Rptr. 671, 588 P.2d 811. The Govern-

ment did not fly firefighting air tankers as part of its regular business, but rather as a matter of course entered into independent contracts with companies such as Aero Union to fulfill most of its firefighting needs. *See id.* Aero Union pilots were only required to be available for the five-month mandatory availability period of the one-year Contract. (Ex. A 1995 Schedule of Items.)

The Government's citation to *Marsh v. Tilley Steel Co.*, 26 Cal.3d at 486, 162 Cal.Rptr. 320, 606 P.2d 355, is not helpful to the defense, nor is the case even apposite. In *Marsh*, the California Supreme Court reversed a trial court's non-suit which had held that plaintiff could not sue a general employer of a "special co-employee" of the plaintiff, because the "special employee's" immunity based on the Fellow Servant Doctrine would also immunize a general employer of the "special co-employee," even though there was no contention that such general employer was the special employer of the plaintiff. In the course of so ruling, the California Supreme Court stated: "We will conclude that, where the negligence of a special employee injures another of the special employer's workers, the victim is not barred by workers' compensation law from suing the general [actual] employer of the tort-feasor in negligence on respondeat superior principles. The general [actual] employer [of the tort-feasor] is liable in tort if, at the time of the injury, it retained total or partial control over the tort-feasor's work." *Id.* at 490, 162 Cal.Rptr. 320, 606 P.2d 355.

In *Marsh*, the Tilley Steel Co. ("Tilley") was a subcontractor on a construction site. The general contractor was Maxwell Construction ("Maxwell"). Marsh, the victim, was an actual employee of Maxwell. Tilley had informally agreed with Maxwell to "loan" a truck-mounted crane and an operator for a short time to assist Maxwell in the placement of concrete forms and certain equipment. This work was not within the contracted-for subcontract, but

rather was done by Tilley at the last-minute request of Maxwell, the decision does not describe any special contract for this temporary assistance, and the Court infers one was not prepared. *See Id.* at 490–91, 162 Cal.Rptr. 320, 606 P.2d 355. During an unloading of the forms from the Maxwell truck, Marsh was injured when some forms being lifted by the Tilley crane operator toppled off the Maxwell truck. Tilley's crane operator was being guided by Marsh at the time. Not insignificantly, the Court observed that "there was ample basis upon which a jury might reasonably have concluded that [the crane operator] was not Maxwell's special employee when the accident occurred, but remained solely the employee of the defendant [Tilley]." *Id.* at 493, 162 Cal. Rptr. 320, 606 P.2d 355. The court concluded that the injured employee of Maxwell could sue Tilley in common law based on respondeat superior because the crane operator's alleged negligence did not bar Marsh's claim against Tilley, even if Marsh and the crane operator were "special co-employees." This was held to be because even if Marsh may have been a special co-employee of the crane operator, that relationship would have been personal between them, and did not preclude Tilley's susceptibility to Marsh's suit, because Tilley would not thereby automatically be the special employer of Marsh. The result of the case is to allow Marsh to recover workers' compensation benefits from Maxwell, and to permit him also to sue Tilley for common law damages based on respondeat superior for the alleged negligence of the crane operator, because even if the employee of Tilley were the "special co-employee" of Marsh, that "co-employee's" general employer (Tilley) would not thereby automatically become the special employer of Marsh.

*Marsh* is grossly dissimilar to the instant case; in fact the parties occupy almost opposite positions. In the instant case, unlike the *Marsh* case, the Government claims it was the special employer of Decedents and therefore immune from respondeat superior liability based on al-leged negligence of its actual USFS pilot-employee. Under these circumstances, the Government would appear to analogize its posture to *Marsh* and assert that Decedents and the USFS pilot who rear-ended their aircraft were "special co-employees." If so, even under *Marsh,* that would create an immunity personal only to them, but not to their actual employers, so that the employer of the Decedents would not automatically have the immunity from suit enjoyed by the Decedents. Even under *Marsh,* then, the Decedents could sue the Government unless the Government were the special employer of the Decedents. *See Kowalski,* 23 Cal.3d at 174–75, 151 Cal.Rptr. 671, 588 P.2d 811. The Court has found it is not, after a full trial on the merits of the dispute.

The Government also relies on *Famous Players Lasky Corp. v. Industrial Accident Comm'n,* 194 Cal. 134, 228 P. 5 (1924). This reliance is also misplaced. In *Famous Players,* Williams Brothers Aircraft Corp. ("Williams") contracted out to Famous Players Lasky Corp. ("Famous Players") two airplanes and pilots to be flown in a movie that Famous Players was making. Famous Players instructed the Williams pilot to fly the plane close to the ground so that it could be seen within the frame of the picture. The Williams pilot objected for fear that it was dangerous, but eventually agreed. Upon flying close to the ground, the plane hit an air pocket and crashed, seriously injuring the pilot. The pilot filed for workers' compensation against both Williams and Famous Players. In this case, the Industrial Accident Commission of the State of California awarded the pilot workers' compensation from both Williams and Famous Players. Famous Players petitioned for a writ of review seeking to have the workers' compensation award reversed, alleging that it was *not* the special employer and therefore not liable for workers' compensation.

Thus, *Famous Players* was not a suit by the pilot against Famous Players seeking damages, but rather simply a request by

Famous Players for appellate review of an award of workers' compensation to the pilot based on a finding by the Industrial Accident Commission of special employment between the pilot and Famous Players. While the Workers' Compensation Appeals Boards liberally construes special employment when necessary to find workers' compensation coverage, "courts generally are more exacting in requiring proof of an employment relationship when such a relationship is asserted as a defense" to a common law action. *See Spradlin v. Cox,* 201 Cal.App.3d 799, 807–808, 247 Cal.Rptr. 347 (Cal.Ct.App.1988) (citing *Laeng v. Workmen's Comp. Appeals Bd.,* 6 Cal.3d 771, 779 fn. 8, 100 Cal.Rptr. 377, 494 P.2d 1 (1972)); *see also* Larson, Workers' Compensation Law, § 47.42(a), p. 8–371 (1998). The more exacting standard is required because there "is not perfect symmetry in what is at stake in the two situations: The first is a matter of providing protective statutory benefits, while the second is a matter of destroying valuable common-law rights that have existed for centuries." Larson, § 47.42(a). Thus, *Famous Players* is decided under a different standard of law and does not apply to the analysis in the instant case. Rather, this case is governed by *Kowalski,* which sets forth a multi-factor test under which upon close examination, a special employment relationship cannot be found to have existed here between the Government and the Decedents.

The Court finds that the Contract between Aero Union and the Government was nothing more than a typical independent contract. The Parties did not intend to create, and as a matter of fact did not create, an employment relationship between the Government and the air and maintenance crews employed by Aero Union to fulfill the terms of its service contract. The Government relies on agreed-to requirements to be performed by Aero Union under the Contract, for which the Government agreed to pay a contract price to be paid to Aero Union. But such is the typical nature of service contracts. In additional provisions of the Contract which

the Government simultaneously agreed to, Aero Union agreed to provide and employ all personnel necessary to perform the Contract. The Government seems to ignore those agreed-to terms.

Analogizing this case to any typical independent contract situation illustrates the typicality of this Contract. For example, imagine that the management of ABC Condominiums (i.e. homeowners association) ("ABC") wants to replace the roofs throughout its condominium complex and hires the XYZ Roofing Co. ("XYZ") to do the job. As with any independent contract relationship, the ABC management will dictate many of the requirements regarding the roofing job, but nothing that would indicate a special employment relationship by giving ABC control or the right to control *how* the roofers accomplished the details of their trade. Under the terms of the contract between ABC and XYZ, ABC understandably sets forth many specifications and requirements. ABC chooses the brand, color, and quality of roofing material to be used on the roofs, including such detail as specifying use of rust-proof nails of a certain size and head designed to create a seal when used on roofs. ABC also sets forth requirements such as how many vertical inches each row of shingles shall be apart. Since ABC has three different kinds of condominiums ("condos"), it actually contracts for different material to be used on each of these types of condos. ABC specifies that it wants the roofers there from 9 a.m. to 5 p.m. Monday through Friday, except holidays, and *only* at those times so as not to disturb residents. Since ABC managers several hundred condos, XYZ is contracted for a period of several months to complete the work for a set contract price. ABC also has minimum requirements for the roofers themselves. ABC requires them to be apprenticed roofers who are part of the local union. Finally, since the roofers will be working around the complex for several months, and since ABC has both residents and a permanent maintenance staff, ABC contracts to meet with the roofers before

they begin. Because ABC's permanent staff is trusted by the residents and is allowed entry at any time into the residents' condos to make necessary repairs, the XYZ roofers are instructed to never hold themselves out as ABC employees to the residents or to the other ABC employees. ABC also reviews some general policies and guidelines it requires be followed, such as a strict prohibition against harassment of the residents or ABC employees. ABC requires XYZ to certify that each roofer will be working in the United States legally, and requires each employee of XYZ to carry a card which certifies the legality of such employee to work within the United States. If ABC encounters anyone not so certified, ABC can require XYZ to remove such employee from ABC's job. Furthermore, as advised by ABC's lawyer, ABC also contracts to have XYZ provide policies of workers' compensation insurance on their roofers and liability insurance, the latter of which names ABC as an additional insured under the policy for the duration of the work. Finally, because ABC has high quality standards, and residents who demand the same, ABC contracts to have the ability to remove from this job any worker who, in the opinion of ABC, is either not roofing to ABC's satisfaction, or not conducting himself or herself appropriately in relation to the residents and ABC employees.

Now further imagine that while the roofers were performing under the terms of this service contract, one of ABC's permanent employees was trimming a large tree in the vicinity of the roofers. The ABC employee negligently trimmed a branch that fell on one of the roofers, who died as a result of the accident. ABC concedes liability, but attempts to assert a special employment relationship to avoid tort liability based on their many contract requirements agreed to by XYZ. Viewed by this Court, under the special employment factors established by *Kowalski*, no reasonable trier of fact would find a special employment relationship between the deceased roofer and ABC management. It was simply an independent contract

whereby the roofer was employed by XYZ, and was assigned by XYZ to work on the service contract it had with ABC to roof its condos. The many agreed-to stipulations of the service contract do not convert it into a special employment relationship. None of the agreed-to requirements concern the details of skill required to be possessed and used by the roofers.

Similarly, in the instant case, all the Government did was dispatch the Decedents to particular fires when needed and tell them where to drop the retardant. Other details that are alleged as relevant by the Government, such as the pre-work conference, setting a minimum wage, and having the ability to remove an Aero Union employee from the contracted work, are all reasonable requirements of an independent contract relationship. This fraction of control and contracted-for service requirements do not transform the Government into the special employer of the Decedents.

The Court holds that the Government, at all material times, was not the "special employer" of the Decedents, who are therefore entitled to sue the Government under the Tort Claims Act for damages. Workers' compensation laws do not bar this action.

## IV. CONCLUSION

Plaintiffs shall prepare proposed findings of fact and conclusions of law on this separate affirmative defense of special employment, consistent with this Decision. This document shall be submitted to the Court within fifteen days of the filing of this Decision. Defendant shall have fifteen days from receipt to respond with objections or corrections. The Court will settle all disputes regarding findings of fact and conclusions of law. The Court will hold a status hearing on June 7, 1999, at 10:30 a.m. to schedule the date of trial of the final issue of damages. Judgment

and a determination of costs will abide the resolution of damages.

IT IS SO ORDERED.