[No. B198347. Second Dist., Div. Seven. May 14, 2008.]

CHRISTOPHER CASO et al., Plaintiffs and Appellants, v.
NIMROD PRODUCTIONS, INC., et al., Defendants and Respondents.

### COUNSEL

McNicholas & McNicholas, John P. McNicholas, Robert P. Wargo; and Joshua M. Merliss for Plaintiffs and Appellants.

Law Office of Thomas H. Edwards and Thomas H. Edwards for Defendants and Respondents.

### OPINION

**PERLUSS, P. J.**—Christopher Caso and his wife, Anna Marie Caso, appeal from the judgment entered in their personal injury action after the trial court granted summary judgment in favor of Peter O'Fallon, Merritt Yohnka and Randy Hall, as well as their respective loan-out corporations Ryan Productions, Inc. (RPI), Merritt Yohnka, Inc. (MYI), and Nimrod Productions, Inc. (NPI). The trial court ruled the Casos' claims were barred by workers' compensation exclusivity. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Accident and the Lawsuit*

Christopher Caso, a professional stuntman, suffered severe head injuries while performing a stunt for a television show called *MD's*, a program produced in 2002 by Touchstone Television Productions (Touchstone). Following the accident, the Casos sued O'Fallon, Yohnka and Hall, as well as RPI, MYI and NPI. Caso asserted claims for negligence; Anne Marie Caso alleged loss of consortium.[1]

According to the allegations in the complaint, the stunt Caso performed required him to fall through a scored drywall ceiling onto a collapsible gurney and crash pad. Yohnka, who was scheduled to be the stunt coordinator for the stunt, advised Caso and Touchstone a few days in advance that, due to an unforeseen scheduling conflict, he would be unavailable the date the stunt was to be performed. Pursuant to Yohnka's recommendation, Yohnka was replaced by Hall. On the day of the stunt, Hall and O'Fallon refused Caso's request to drill a hole in the ceiling and failed to ensure the center of the crash pad was properly placed. The crash pads, which had been provided by Yohnka, were also poorly maintained. Because of Yohnka, Hall, and

---

[1] The Casos also named Paul Marks, Chris Della Pena, Bill Doane, Alex Felix, Tommy Roysden and Touchstone as defendants in the lawsuit. Those defendants have since been dismissed. None is a party to this appeal.

O'Fallon's failures to prepare properly for the stunt, the Casos alleged, Caso fell to the ground at an improper angle, missing part of the crash pad and slamming his head on the ground.

### 2. *The Summary Judgment Motions*

O'Fallon, Yohnka, and Hall moved for summary judgment on the ground each of them was a special employee of Touchstone at the time the accident occurred and was acting in the scope of that special employment. Thus, under Labor Code section 3601, subdivision (a),[2] workers' compensation remedies were the exclusive remedies available for a work-related injury to Caso caused by the negligence of a coemployee.[3] The loan-out corporations filed their own motion for summary judgment contending none of them was vicariously liable for its individual employee's negligence because each had relinquished full control over its respective employee to Touchstone.

The motions were consolidated. In support of the consolidated motions, O'Fallon, Yohnka and Hall each testified the use of loan-out corporations was a common practice in the entertainment industry. When an individual is hired by a producer to work on a production, the individual informs the producer he or she has a loan-out corporation.[4] Then, three-way contracts are entered into in which the loan-out corporation agrees to furnish the services of its owner and sole employee to the producer; the producer agrees to pay the loan-out corporation for the owner/employee's services; and the owner/employee agrees to the arrangement. The loan-out corporation itself does not participate in any way in the production after the loan-out agreement is signed except to receive payment for its owner/employee's services.

Each of the individual defendants and his loan-out corporation signed a "television player loan-out agreement" with Touchstone. Those agreements

---

[2] Labor Code section 3601, subdivision (a), provides, "Where the conditions of compensation set forth in Section 3600 concur, the right to recover such compensation, pursuant to the provisions of this division is, except as specifically provided in this section, the exclusive remedy for injury or death of an employee against any other employee of the employer acting within the scope of his or her employment, except that an employee, or his or her dependents in the event of his or her death, shall, in addition to the right to compensation against the employer, have a right to bring an action at law for damages against the other employee, as if this division did not apply, in either of the following cases: [¶] (1) When the injury or death is proximately caused by the willful and unprovoked physical act of aggression of the other employee. [¶] (2) When the injury or death is proximately caused by the intoxication of the other employee."

Statutory references are to the Labor Code.

[3] For purposes of the consolidated summary judgment motions only, Caso did not dispute he was an employee of Touchstone.

[4] O'Fallon was the president and sole owner of RPI; Yohnka was the president and sole owner of MYI; Hall was the president and sole owner of NPI.

stated the corporate defendant was "loaning-out" its employee as outlined in the "attached employment agreement," subject to the applicable collective bargaining terms.[5] The employment agreements signed by O'Fallon, Yohnka and Hall also incorporated an "inducement" page in which O'Fallon, Yohnka and Hall acknowledged "an employment relationship exists between [Touchstone] and me, [Touchstone] being my special employer under the Agreement." The employment agreements also provided in the event of any injury the parties' rights would be governed by, and their remedies limited to, those specified in the workers' compensation laws. Touchstone's contract with RPI and O'Fallon was even more specific. It provided O'Fallon would "obey all rules and regulations from time to time promulgated by Touchstone . . . it being understood that Director's [O'Fallon's] employment hereunder will be subject to the direction and control of Touchstone, and it being understood further that nothing in this Agreement will restrain or prevent Touchstone from terminating Director's employment hereunder at any time because of Director's failure to render services in accordance with the provisions of this Agreement." The agreement also stated O'Fallon's services would be performed at such places as "Touchstone may from time to time designate," and Touchstone retained the right to "cut, edit, add to, subtract from, arrange, rearrange, adapt, change, colorize, vary, transform, alter, shorten and revise" the program "in any manner and by any method which Touchstone may in its sole discretion determine."

O'Fallon testified he understood he was an employee of Touchstone during the production of the *MD's* episode; he reported directly to Paul Marks and Ken Topolsky, Touchstone producers, and understood Touchstone had the ultimate authority over his direction. Yohnka and Hall similarly testified they believed they were employees of Touchstone, based upon the terms in their employment agreements and the fact that their employment relationship was subject to the terms of the collective bargaining agreements between Touchstone and the Screen Actors Guild. Both Yohnka and Hall explained all the work they did for the *MD's* episode, including planning and choreographing Caso's stunt, was subject to the detailed supervision and control of Marks and O'Fallon.

Each defendant proffered evidence that the loan-out corporations played no part in the production of the *MD's* episode other than to receive payments from Touchstone. Yohnka also testified it was customary for the stunt coordinator to obtain equipment needed to perform the stunt and then seek

---

[5] O'Fallon is a member of the Directors Guild of America. His employment agreement incorporated the daily rate provided in the standard Directors Guild agreement. Yohnka and Hall are members of the Screen Actors Guild. Their employment agreements with Touchstone incorporated a standard Screen Actors Guild "three day or weekly player's agreement," subject to the provisions of the collective bargaining agreement between the Screen Actors Guild and the producers.

reimbursement from the studio. In this case, Yohnka provided the crash pads used in the stunt with the intent to bill Touchstone, but did not do so after the accident.

The Casos filed an opposition to the consolidated motions, arguing triable issues of fact existed as to whether O'Fallon, Yohnka and Hall were special employees of Touchstone and whether their loan-out corporations had relinquished all control over them for purposes of the production in which Caso was injured. They cited evidence O'Fallon, Yohnka and Hall remained on the payroll of their respective loan-out corporations while working on the *MD's* project, as well as evidence that, although Touchstone had the right to terminate any of them for any reason, it was still required to pay them their service compensation under the "employment" agreement. In addition, the Casos emphasized O'Fallon, Yohnka and Hall were highly skilled at their jobs and had a great deal of discretion in how to perform their services for Touchstone.

The trial court granted the consolidated summary judgment motions, finding O'Fallon, Yohnka and Hall were special employees of Touchstone and had been acting in the scope of that employment at the time the accident occurred. Accordingly, the action against each of them by their coemployee was precluded by section 3601. The court also concluded the loan-out corporations did not retain any control over their employees during the loan-out period and thus could not be held vicariously liable for the acts of their employees. Because Anne Marie Caso's claim for loss of consortium was based on her husband's work-related injury for which workers' compensation was the exclusive remedy, her claim failed as well.

## CONTENTION

The Casos contend summary judgment was improperly granted because triable issues of material fact exist concerning whether O'Fallon, Yohnka and Hall were "special employees" of Touchstone and whether their respective loan-out corporations had relinquished full control over their employees to Touchstone.

## DISCUSSION

1. *Standard of Review*

We review the trial court's grant of summary judgment de novo and decide independently whether the parties have met their respective burdens and whether facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348

[1 Cal.Rptr.3d 32, 71 P.3d 296]; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; Code Civ. Proc., § 437c, subd. (c).)

> 2. *The Trial Court Did Not Err in Concluding as a Matter of Law the Casos' Claims Were Barred by Workers' Compensation Exclusivity*

■ Section 3351 defines an employee as "every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed . . . ." ■ Apart from certain exceptions not relevant to this case, the "exclusive remedy for injury or death of an employee against any other employee of the employer acting within the scope of his or her employment" is benefits under the workers' compensation laws. (§ 3601, subd. (a).) This statutory restriction does not affect the employee's rights to tort damages from individuals or entities with whom the employee has no employment relationship. (§ 3852; *Marsh v. Tilley Steel Co.* (1980) 26 Cal.3d 486, 495 [162 Cal.Rptr. 320, 606 P.2d 355] (*Marsh*).) For purposes of this summary judgment motion only, Caso does not dispute he was an employee of Touchstone. However, he argues triable issues of material fact exist as to whether O'Fallon, Yohnka and Hall were special employees of Touchstone. If they were independent contractors rather than special employees, he correctly observes, his claim is not barred by workers' compensation exclusivity. (See, e.g., *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 349 [256 Cal.Rptr. 543, 769 P.2d 399] (*Borello*) [workers' compensation exclusivity does not apply to independent contractors].)

> a. *The doctrine of special employment*

■ When an employer lends an employee to another employer and relinquishes to the borrowing employer some right of control over the employee's activities, a "special employment relationship" arises between the borrowing employer and the employee. (*Marsh, supra*, 26 Cal.3d at p. 492.) "Once a special employment relationship is identified, two consequences ensue: (1) the special employer's liability for workers' compensation coverage to the employee, and (2) the employer's [and its other employees'] immunity from a common law tort action, the latter consequence flowing from the exclusivity of the compensation remedy embodied in Labor Code section 3601." (*Santa Cruz Poultry, Inc. v. Superior Court* (1987) 194 Cal.App.3d 575, 578 [239 Cal.Rptr. 578]; see also *Kowalski v. Shell Oil Co.* (1979) 23 Cal.3d 168, 175 [151 Cal.Rptr. 671, 588 P.2d 811] (*Kowalski*).)

■ "In determining whether a special employment relationship exists, the primary consideration is whether the special employer has ' "[t]he right to

control and direct the activities of the alleged employee or the manner and method in which the work is performed, whether exercised or not . . . ." ' " (*Kowalski, supra,* 23 Cal.3d at p. 175; see *Borello, supra,* 48 Cal.3d at p. 350.) The decision turns on "(1) whether the borrowing employer's control over the employee and the work he is performing extends beyond mere suggestion of details or cooperation; (2) whether the employee is performing the special employer's work; (3) whether there was an agreement, under-standing, or meeting of the minds between the original and special employer; (4) whether the employee acquiesced in the new work situation; (5) whether the original employer terminated [its] relationship with the employee; (6) whether the special employer furnished the tools and place for perfor-mance; (7) whether the new employment was over a considerable length of time; (8) whether the borrowing employer had the right to fire the employee and (9) whether the borrowing employer had the obligation to pay the employee." (*Riley v. Southwest Marine, Inc.* (1988) 203 Cal.App.3d 1242, 1250 [250 Cal.Rptr. 718].) ■ Circumstances tending to negate the existence of a special employment relationship include situations in which "[t]he employee is (1) not paid by and cannot be discharged by the borrower, (2) a skilled worker with substantial control over operational details, (3) not engaged in the borrower's usual business, (4) employed for only a brief period of time, and (5) using tools and equipment furnished by the lending employer." (*Marsh, supra,* 26 Cal.3d at p. 492.)

■ Although the terms of a contract may specify that a special employer retains the right to control the details of an individual's work or purports to establish an employment relationship, " 'the terminology used in an agree-ment is not conclusive . . . even in the absence of fraud or mistake.' " (*Kowalski, supra,* 23 Cal.3d at p. 176.) There still must be evidence to support the inference to be drawn from the contract terms. (*Ibid.*)

Whether a special employment relationship exists generally is a question of fact. (*Kowalski, supra,* 23 Cal.3d at p. 175 [where evidence, though not in conflict, permits conflicting inferences, existence of special employment relationship is question of fact].) If neither the facts nor inferences are in conflict, however, the question is one of law that may be decided on summary judgment. (*Wedeck v. Unocal Corp.* (1997) 59 Cal.App.4th 848, 857 [69 Cal.Rptr.2d 501] (*Wedeck*); *Johnson v. Berkofsky-Barret Productions, Inc.* (1989) 211 Cal.App.3d 1067, 1071 [260 Cal.Rptr. 67] ["[w]here the facts of employment are not disputed, the existence of a covered relationship is a question of law"].)

b. *The undisputed facts demonstrate O'Fallon, Yohnka and Hall were special employees of Touchstone*

■ O'Fallon, Yohnka and Hall satisfied their burden on summary judgment to demonstrate they were special employees of Touchstone. Not only did the employment agreements between Touchstone and each of the individual defendants expressly identify O'Fallon, Yohnka and Hall as "special employees," subject to both the benefits and limitations of the workers' compensation laws, but also the evidence supported Touchstone's ultimate authority to control and direct each of the individual defendants' activities on the *MD's* set: O'Fallon testified, consistent with the terms of his contract, that Touchstone retained control over the entire production, including the ability to create, edit and even transform the production as it saw fit. O'Fallon reported to Touchstone producers; Yohnka and Hall reported to O'Fallon. Each of them was performing work that was the regular business of Touchstone at a studio supplied by Touchstone, and Touchstone either supplied or had the ultimate authority to supply tools and instrumentalities used in connection with the production. Although Yohnka provided the crash pads, he acted as any other third party contracting with Touchstone to supply instrumentalities needed for the production.

Although O'Fallon, Yohnka and Hall received their paychecks from their respective loan-out corporations rather than from Touchstone, the undisputed evidence established the relationships with their loan-out corporations were administrative only, existing solely for payment purposes. (See *Wedeck, supra*, 59 Cal.App.4th at p. 861, fn. 8 [payment by the general employer "is not particularly enlightening in determining whether a special employment relationship exists [citation], particularly in the labor brokerage context where the general employer often handles administrative details, including payroll"].) Moreover, although the length of their respective employments was relatively short—O'Fallon was employed for one month at a time; Yohnka and Hall for just a few days—it was also standard practice in the entertainment industry to employ the person solely for the length of time his or her services were needed for the specific production.

The Casos do not meaningfully dispute any of the facts underlying the conclusion O'Fallon, Yohnka and Hall were special employees of Touchstone. Rather, they argue—unpersuasively—those facts also support the conflicting inference Touchstone did not have the right to direct O'Fallon, Yohnka or Hall's performance of their jobs. They also insist the trial court erred in placing any reliance on the employment contracts with Touchstone identifying O'Fallon, Yohnka and Hall as "special employees." (See *Borello, supra*, 48 Cal.3d at p. 349 ["[t]he label placed by the parties on their relationship is not

dispositive, and subterfuges are not countenanced"]; *Kowalski, supra,* 23 Cal.3d at p. 176 ["contract is not conclusive evidence of the existence of the right to control . . ."].)

The Casos observe O'Fallon, Yohnka and Hall were engaged in highly skilled activities and were responsible for choreographing the stunt, raising the inference they, not Touchstone, were in control of the details of the stunt. (See *Kowalski, supra,* 23 Cal.3d at p. 176 ["'paramount consideration [for special employment] appears to be whether the alleged special employer exercises control over the details of [an employee's] work'"].) Relying on *Von Beltz v. Stuntman, Inc.* (1989) 207 Cal.App.3d 1467 [255 Cal.Rptr. 755] (*Von Beltz*), a case they characterize as "on all fours" with the instant matter, they argue the record before this court reasonably supports the inference the individual defendants were independent contractors, thus precluding summary judgment.

In *Von Beltz, supra,* 207 Cal.App.3d 1467, a stuntwoman was seriously injured when the stunt car in which she was riding collided with another car involved in a scene for the movie The Cannonball Run (Twentieth Century Fox 1981). The stuntwoman (Von Beltz) sued the director (Needham) and his loan-out corporation (Stuntman, Inc.) for negligence. Needham claimed he was employed by the same production company, Cannonball Productions, Inc., that employed Von Beltz and thus was a coemployee, limiting Von Beltz's recovery to workers' compensation benefits. Stuntman, Inc., the loan-out company, asserted Needham was not its agent, precluding its liability to Von Beltz on a respondeat superior theory. The evidence established, however, that Needham had contracted through Stuntman with North Shore Investments to direct the movie. Cannonball Productions was formed to produce the movie only when other financial interests were brought into the deal. (*Id.* at pp. 1474–1475.)

The issues were tried to a jury, which found Needham was not an employee of Cannonball Productions. The Court of Appeal affirmed, concluding sufficient evidence supported the jury's verdict. Although the appellate court recognized some evidence indicated Cannonball Productions had authority over Needham and could override his direction, tending to show Needham was in fact its employee, the court emphasized Needham's actual employment contracts were with Stuntman and North Shore Investments. (*Von Beltz, supra,* 207 Cal.App.3d at pp. 1486–1487.)

Unlike the situation in *Von Beltz, supra,* 207 Cal.App.3d 1467, there is no conflicting evidence for the jury to resolve, nor does the undisputed evidence permit any conflicting inferences. In *Von Beltz* Needham's loan-out company contracted with North Shore Investments for the director's services. North

Shore Investments, in turn, joined forces with Cannonball Productions, Von Beltz's employer. Here, in contrast, O'Fallon, Yohnka and Hall, through their respective loan-out corporations, contracted directly with Touchstone, the company that, according to the undisputed evidence, had ultimate authority and control over the performance of their activities for the *MD's* episode. To be sure, O'Fallon, in his capacity as director, and Yohnka and Hall, in their capacities as stunt coordinators, had a good deal of discretionary authority in their respective positions. But that authority was really no different than any supervisorial employee's. (See *Wedeck, supra*, 59 Cal.App.4th at p. 859 [although experienced employee may not require active supervision, he or she is an employee if employer has the right, even if unexercised, of control].) The undisputed evidence, including the specific language in O'Fallon's contract, established that ultimate authority over the production, both substantive and aesthetic, belonged not to O'Fallon, or to Yohnka or Hall over whom O'Fallon had supervisorial authority, but to Touchstone.

The Casos' reliance on the federal district court's decision in *Cockrell v. U.S.* (S.D.Cal. 1999) 101 F.Supp.2d 1291 is misplaced. In *Cockrell* the court held no special employment relationship existed between the United States government and Aero Union Corporation, which furnished tanker aircraft and qualified crew to the United States Forest Service, despite a contract providing that the government had the exclusive control over the air services' operations. The district court found nothing in either the contract itself or in the testimony of the parties indicating a special employment relationship was ever contemplated. (*Id.* at p. 1293.) In contrast, the employment contracts in the instant case, as well as the testimony provided in support of the consolidated motions for summary judgment, unequivocally establish the intent to create such an employment relationship.

Finally, the Casos contend a reasonable inference could be drawn that each of the corporate defendants (that is, the loan-out companies) was engaged in a "project of mutual interest" with Touchstone, such that no transfer of control over the borrowed employee's activities occurred. (See *Marsh, supra*, 26 Cal.3d at p. 493 ["where the servants of two employers are jointly engaged in a project of mutual interest, each employee ordinarily remains the servant of his own master and does not thereby become the special employee of the other"].) In *Marsh* a truck driver (Marsh) sued Tilley Steel, the employer of a crane operator, for personal injuries Marsh had suffered as a result of the crane operator's (Wynglarz's) negligence. Marsh was employed by Maxwell, a general contractor. The trial court granted a nonsuit in favor of Tilley Steel, ruling that, because Maxwell exercised control over Wynglarz, the latter had become a special employee of Maxwell at the time the accident occurred. Thus, Marsh and Wynglarz were coemployees, and Marsh was limited to recovering benefits under the workers' compensation laws. The Supreme Court reversed, concluding a reasonable juror could find Tilley Steel and

Maxwell were engaged in a project of "mutual interest" involving no transfer of control over Wynglarz to Maxwell. Citing evidence Wynglarz's performance of the job lasted less than a day, he remained on Tilley Steel's payroll and he retained unlimited discretion to operate the crane as he deemed necessary to achieve the results Maxwell desired, the court held a reasonable juror could find Wynglarz was simply acting under Tilley Steel's orders to do a specific task for Maxwell and remained solely the employee of Tilley Steel. (*Id.* at p. 493.)

The general contractor/subcontractor relationship central to the holding in *Marsh, supra,* 26 Cal.3d 486, is not present here. There is no project of mutual interest. Neither the loan-out corporations nor their employees had a separate interest in the project other than compensation by Touchstone for their participation. Touchstone retained full control not only over the results it desired, but also over the manner in which those results were to be achieved. Nothing in the contracts or the evidence presented suggested O'Fallon, Yohnka and Hall or their respective loan-out corporations retained ultimate authority over their job-related activities while working on Touchstone's production.

> c. *The Casos did not present any evidence from which a jury could infer the corporate defendants retained some control over their respective employees so that they could remain vicariously liable notwithstanding their employees' special employment relationship with Touchstone*

The Casos alternatively contend, even if O'Fallon, Yohnka and Hall were special employees of Touchstone as a matter of law, it is reasonable to infer that the corporate defendants (the loan-out companies) retained some control over them during the loan-out period. After all, O'Fallon, Yohnka and Hall were the owners and sole employees of their respective corporations. Accordingly, although Caso cannot sue the individual defendants because he and they are coemployees, he is not an employee of the loan-out corporations and is thus not precluded by the workers' compensation exclusivity doctrine from suing any of the corporate defendants under a respondeat superior theory. (See *Marsh, supra,* 26 Cal.3d at pp. 494–495 ["Facts demonstrating the existence of a special employment relationship do not necessarily preclude a finding that a particular employee also remained under the partial control of the original employer. Where general and special employers share control of an employee's work, a 'dual employment' arises, and the general employer remains concurrently and simultaneously, jointly and severally liable for the employee's torts."]; see also *Industrial Ind. Exch. v. Ind. Acc. Com.* (1945) 26 Cal.2d 130, 135 [156 P.2d 926] ["it is settled that 'a general and special employment relationship is present if there exists in each some power, not

necessarily complete, of direction and control' "]; accord, *Von Beltz, supra,* 207 Cal.App.3d at p. 1488 [general employer/loan-out corporation liable to plaintiff for tort of its general employee absent finding general employer had relinquished full control over general employee to special employer].)

To impose liability on the corporate defendants under this analysis, the Casos must be able to establish (or, in the context of opposing summary judgment, present evidence creating a triable issue of material fact) the loan-out corporations retained at least some control over their employees during the loan-out period to Touchstone. (*Marsh, supra,* 26 Cal.3d at pp. 494–495; cf. *Societa per Azioni de Navigazione Italia v. City of Los Angeles* (1982) 31 Cal.3d 446, 456 [183 Cal.Rptr. 51, 645 P.2d 102] ["[i]f the borrowed servant commits a tort while carrying out the bidding of the borrower, vicarious liability attaches to the borrower and not to the general master"].) "Self-control," however, is not the type of control required to prove a dual employment relationship. Thus, whatever superficial appeal there may be to the argument the loan-out corporations and their employees were one and the same, and therefore necessarily could control themselves, there is simply no evidence that the loan-out corporations, in fact, retained any control over O'Fallon, Yohnka and Hall during the loan-out period or that they were involved in any aspect of the production other than serving as a legal vehicle for the receipt of payment on behalf of their employees. (Cf. *Von Beltz, supra,* 207 Cal.App.3d at p. 1488 [holding, in light of jury's findings, whether director Needham's loan-out company, "as a corporate entity, was capable in and of itself of controlling Needham is beside the point," but acknowledging trial court's observation, based on evidence Needham as president and sole shareholder controlled the loan-out company, not vice versa, that " 'in reality [it] is impossible' " for " 'the corporation which he owns' " to control him].) O'Fallon, Yohnka and Hall may indeed be the alter egos of their respective loan-out corporations and, therefore, potentially liable for the torts of their respective corporations to the same extent their corporations are liable, but that is a far different matter from finding the loan-out corporations retained any control over their activities while they were engaged as special employees of Touchstone.

### d. *Anne Marie Caso's loss of consortium claim is also barred*

Section 3600 provides that payment of workers' compensation benefits is "in lieu of any other liability whatsoever to any person"; section 3601 provides that receipt of those benefits is the "exclusive remedy" for the injury or death of an employee against any other employee of the employer acting within the scope of his or her employment. In light of our conclusion Caso's negligence claims against O'Fallon, Yohnka and Hall are barred by workers' compensation exclusivity, so too is Anne Marie Caso's claim for loss of

consortium. (See *Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 162–163 [233 Cal.Rptr. 308, 729 P.2d 743] ["[a]lthough the cause of action for loss of consortium is not merely derivative or collateral to the spouse's cause of action [citation], it is based on the physical injury or disability of the spouse, and is precluded by the broad language of the Labor Code sections" 3600 and 3601 governing workers' compensation exclusivity]; accord, *Colombo v. State of California* (1991) 3 Cal.App.4th 594, 599 [5 Cal.Rptr.2d 567].)

## DISPOSITION

The judgment is affirmed. O'Fallon, Yohnka, Hall, RPI, MYI and NPI are to recover their costs on appeal.

Woods, J., and Zelon, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 17, 2008, S164582.